[No. S026040. Mar. 7, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD JOHN VIEIRA, Defendant and Appellant.

## Counsel

Richard L. Rubin, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, J. Robert Jibson, John A. O'Sullivan, Julie A. Hokans and Catherine Chatman, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**MORENO, J.**—A jury convicted defendant Richard John Vieira of four counts of murder (Pen. Code, § 187).[1] An enhancement for personal use of a deadly weapon was found true for each count. (§ 12022, subd. (b).) Defendant was also convicted of one count of conspiracy to commit murder. (§ 182.) The special circumstance of multiple murder was found true as to each count. (§ 190.2, subd. (a)(3).) At the penalty phase, the jury fixed the penalty for count one, the murder of Richard Ritchey, at life imprisonment without parole. For the three other murders and the conspiracy to commit murder, the jury returned a verdict of death. The trial court denied defendant's motion to modify the death verdict (§ 190.4, subd. (e)) and sentenced defendant to life imprisonment without parole on the first count and to death on the other four counts, with a one-year enhancement for each count, with the terms all to run consecutively.

Defendant's appeal is automatic. (§ 1239, subd. (b).) We reverse the death sentence as to the conspiracy to commit murder count and remand so that defendant may be resentenced to a term of 25 years to life imprisonment. We uphold defendant's death sentence as to the other three counts and in all other respects affirm the judgment.

### I. Factual Background

#### A. *Guilt Phase*

At the time the murders took place in 1990, defendant lived at a location known as "the Camp" at 4150 Finney Road in Salida in Stanislaus County. The Camp consisted of a number of houses and trailers. Defendant lived in a trailer with codefendant David Beck, near a house occupied by codefendant Gerald Cruz and his wife. Codefendant Jason LaMarsh lived in another

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

nearby trailer. Cruz was the acknowledged leader of this informal group. Beck was generally in charge of discipline. Everyone in the group pooled their money. Ron Willey was also associated with the group, but did not live at the Camp during the relevant time period. Defendant held a low status within the group. Michelle Evans,[2] who was also involved in the group and was for a time LaMarsh's girlfriend, testified that defendant was a "slave" to the other members of the group, and was given such tasks as cooking, bathing Cruz's children, and undertaking various repairs. According to her testimony, defendant was beaten by Beck, at Cruz's order, for various deficiencies in his work. He was also given the task of guarding the camp late into the night, as well as often spending days doing construction work.

Cruz and Beck bought assault weapons and several camouflage masks and knives. Two weeks before the murders, they purchased a police-style baton.

One of the Camp residents, Franklin Raper, a man in his 50's, was known to be selling drugs from his trailer. The noise and other activities attendant upon drug sale and use, as well as hypodermic needles and other drug paraphernalia left by Mr. Raper's customers, became a concern to Cruz and other Camp residents. Also of concern was Raper's treatment of an elderly man named Jiggs. Raper used Jiggs's electricity to power his trailer, refused to compensate him for it, and threatened to kill Jiggs when the latter threatened to disconnect the former's power. Cruz, according to Evans's testimony, looked out for people in the Camp, and became upset by this behavior. He and others asked Raper to leave the Camp, but Raper initially refused.

Then began a series of confrontations between Raper and Cruz's group. Cruz and others pushed Raper's car across the street and set it on fire. Raper agreed to leave the Camp and had his trailer towed to 5223 Elm Street. But Raper returned soon after and destroyed a newly repaired fence near Cruz's house. Cruz had Raper arrested and taken to jail. Two weeks before the murders, Jason LaMarsh and others in the group got into a physical altercation with Raper at the latter's Elm Street residence, accusing him of stealing one of their guns, until others broke up the fight. Later the same evening, Dennis Colwell, one of the people present at the Elm Street residence during the fight, drove slowly by the Camp and was pursued by Cruz and other Camp residents. They dragged Colwell from the car and beat him, seeking to have him tell them what was going on at the Elm Street residence. Defendant watched as the beating took place.

---

[2] Evans, who was charged with the same first degree murder and conspiracy to commit murder charges as defendant, entered into a plea bargain in which she received a one-year sentence in exchange for her trial testimony.

Michelle Evans's sister, Tanya, had lived at the Elm Street residence, but was evicted around the same time as Raper moved his trailer there. Raper lived in the residence and allowed others to stay there as a kind of "crash pad." The afternoon of the murders, Cruz asked Evans to prepare a diagram of the residence. Later that day, Cruz met with Beck, LaMarsh, Evans, Willey and defendant in LaMarsh's trailer. Cruz announced that the plan was to go over to the Elm Street residence "to do 'em and leave no witnesses." Cruz gave each person a plan of entry and an assignment. Evans's task was to enter the residence as a visitor, to account for all the people at the residence and attempt to move them into the living room, to open up the back window and then leave and wait in the car. LaMarsh was to enter with her. Beck was to come in through the back window. Cruz, Willey and defendant were supposed to come through the front door after Evans had completed her assignment. Cruz told the group that whoever "messed up" in carrying out their assignments would "join" the victims, and he looked directly at defendant when he made the statement.

Cruz then handed out weapons to be used. There were two baseball bats, a Ka-bar knife and an M-9 knife. Cruz took one of the knives, along with a police baton. Defendant was given a baseball bat and also had his own .22-caliber handgun. Before going to the Elm Street residence, defendant and Willey were seen swinging their bats and "dancing around" to hard rock music. Defendant and others put on camouflage masks.

The group then proceeded to the Elm Street residence just after midnight on May 21, 1990, driving over together in a Mercury Zephyr. Raper, Colwell, and two others present at the house at the time, Richard Ritchey and Darlene ("Emmie") Paris, were murdered. Donna Alvarez, who had been sleeping in one of the bedrooms when the attack began, managed to escape to a neighbor's house.

Ritchey ran through the front door and into the street. A neighbor (Earl Creekmore) and Evans testified that Willey and Cruz caught up to Ritchey and beat him. Cruz then slit his throat with his knife. Raper's and Colwell's throats were also slit and they had multiple wounds, including severe skull fractures inflicted by a baseball bat or police baton. In Raper's case, the top of the head was caved in and there were severe lacerations to the brain.

Defendant killed Emmie Paris. The day after the murder he told Evans that Paris began screaming and Cruz ordered him to shut her up. Defendant hit her with a baseball bat several times but did not succeed in silencing her. Cruz then handed him his knife and he stabbed her. When this also failed, defendant grabbed Paris's hair and sawed at her throat till "it felt like her head was going to come off." Evans testified that he laughed when he told her

this. According to Dr. Ernoehazy, who performed the autopsy for the coroner, Paris died from a slicing wound to the throat.

Two days later, in a conversation with his girlfriend, Mary Gardner, defendant admitted having been at the murder scene but denied killing anyone. He blamed LaMarsh for allowing Alvarez to escape, telling her that the plan had been to leave no witnesses. Gardner became upset because she knew three of the people who were killed and defendant said that they deserved to die, they had been "warned" and should not have been there.

Police investigating the crime scene found a baseball bat and Ka-bar knife with bloodstains matching those of the victims, as well as several masks that had been worn by the killers. Sheriff's detective Deckard, the principal investigator, questioned Donna Alvarez and from her description of one of the men she had seen, and with the help of passersby acquainted with LaMarsh, he was able to assemble a photographic lineup that included LaMarsh. Alvarez identified him as having been one of the assailants. Suspicion soon focused on the Camp residents. Evans was arrested, and in subsequent statements, implicated her codefendants. Defendant was initially interrogated and released the day after the murders, acknowledging that he knew the codefendants but denying he had any role in the murders and claiming he had been at the Oakdale Motel the night the homicides occurred. Two days later, defendant was arrested and further interrogated. He admitted he participated in planning the murders and that he was present at the murder scene. Initially during the interview, he stated that it had been his function to stand guard in the hall, but later in the interview he admitted that he had struck one of the victims in the legs several times with a baseball bat. Defendant stated that he "completely condoned" the murders.

The defense put on no witnesses disputing the role in the murders that Evans and others attributed to defendant. As will be explained below, the core of the defense was apparently testimony regarding defendant's cult membership and his incapacity to form the requisite criminal intent. For reasons discussed below, the principal defense witness, Randy Cerny, was not permitted to testify at the guilt phase.

### B. *Penalty Phase*

At the penalty phase, the prosecution argued solely the circumstances of the crime and did not allege past violent criminal activity or prior felony convictions on defendant's part.

The defense called several childhood friends, neighbors and family members, who portrayed defendant as a fairly quiet and nonviolent youth. His father introduced him to smoking marijuana when defendant was eight years old. Since that time, defendant became a habitual marijuana user, smoking it at least once a week. He also had trouble in school, having a condition his mother, Barbara Vieira, identified as "lazy eye," which caused him to have difficulty with reading and to be held back a year in the sixth grade. Defendant did not complete high school. He left his regular high school after failing to make the football team, enrolling in a continuation high school which he left after being suspended for possessing marijuana. Soon after, he found work hanging sheetrock with his father and later his uncle. He never learned how to drive. His mother testified that he was a good boy and eager to do chores around the house.

Defendant's sister, Angela Young, testified that it was she who introduced defendant to Cruz and his circle when defendant was 15. (He was 21 at the time of the murders.) Defendant's sister lived for a few months in 1987 and 1988 with Cruz and others in a house in Modesto. Cruz led others in the study of the occult and the performance of supposedly occult rituals that included candles, robes, and chanting. Cruz told Young that "to sacrifice your first newborn was . . . the greatest thing you can ever do" and that it was "for the satisfaction of Satan . . . ," although there was no evidence any such sacrifices had occurred. Young soon moved out of the house, but arranged for her brother, who was seeking independence from the family, to move in.

Defendant's sister and mother testified to changes they noticed in defendant after he went to live with Cruz. He required permission from Cruz to visit his family, and when he did visit, he would telephone Cruz to ask permission to stay for dinner or to have a beer. He always looked tired, with dark circles under his eyes, and was thin, nervous and withdrawn. He often appeared to have been beaten up, with black eyes, fat lips, and slashes on his arms.

A deputy sheriff assigned to the county jail testified that defendant had no incidents of misconduct in his approximately one year and four months of incarceration.

Randy Cerny, a retired deputy sheriff who had become an expert on cults, and lectured on cults for law enforcement agencies, also testified for the

defense. Based on his general study of cults, his review of a diary defendant had written in the 18 months before the murder while living with Cruz, and his interviews with defendant, Cerny formed the opinion that defendant was involved in a "cult style group" with Cruz as the leader. Defendant was subject to "a process of mind control" that included sleep deprivation, regular physical punishment, and minimization of contact with family and others outside the group. According to the diary, the punishment included shock treatments with an exposed electric wire, beatings from other members of the group, and various forms of sexual humiliation. Cerny testified that it was apparent from the diary that defendant had internalized many of Cruz's values: in it he expressed the desire to sacrifice himself so that Cruz's health would improve and expressed gratitude for Cruz being "merciful" in not having him beaten when he made a certain mistake. Cerny also described the cult as having occult and satanic underpinnings, with Cruz directing the members of the group to read and study the books of the English occultist Alistair Crowley, of whom Cruz believed himself to be the reincarnation, and to engage in various rituals.

On cross-examination, Cerny admitted he had no way of verifying that the events described in the diary actually occurred. He also related, at the prosecution's behest, portions of the diary in which defendant wrote about administering punishment to another member of the group, entertaining obsessive and sometimes violent fantasies about a woman who had rejected him, and participating in the group's heavy use of drugs.

## II. PRETRIAL ISSUES

### A. Denial of Motion to Change Venue

Defendant contends his motion to change venue, made several times during the proceedings, was wrongly denied, which he claims was error under state law and a violation of his right to be tried by an unbiased jury under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution. We conclude the trial court committed no error.

#### 1. The Law

■ " 'A change of venue must be granted when the defendant shows a reasonable likelihood that in the absence of such relief, a fair trial cannot be

had. [Citations.] Whether raised on petition for writ of mandate or on appeal from judgment of conviction, the reviewing court must independently examine the record and determine de novo whether a fair trial is or was obtainable. [Citations.] The factors to be considered are the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim.' " (*People v. Williams* (1989) 48 Cal.3d 1112, 1125 [259 Cal.Rptr. 473, 774 P.2d 146] (*Williams*).)

■ As we further stated in *Williams*: "Of course, the question presented on appeal from a judgment of conviction is necessarily different from that on a petition for writ of mandate. . . . [¶] . . . [B]ecause the prejudicial effect of publicity before jury selection is necessarily speculative, it is settled that ' "any doubt as to the necessity of removal . . . should be resolved in favor of a venue change." ' [Citation.] After trial, any presumption in favor of a venue change is unnecessary, for the matter may then be analyzed in light of the voir dire of the actual, available jury pool and the actual jury panel selected. The question then is whether, in light of the failure to change venue, it is reasonably likely that the defendant in fact received a fair trial. [Citation.] [¶] Whether raised on petition for writ of mandate or on appeal from a judgment of conviction, however, the standard of review is the same. A showing of actual prejudice 'shall not be required.' [Citations.] In a pretrial motion for change of venue, defendant need only demonstrate a 'reasonable likelihood' that absent such relief a fair trial cannot be had. [Citation.] On appeal after judgment, the defendant must show a reasonable likelihood that a fair trial was not had. [Citations.] In either case, '[t]he phrase "reasonable likelihood" denotes a lesser standard of proof than "more probable than not." ' [Citations.]" (*Williams, supra*, 48 Cal.3d at pp. 1125–1126.)

### 2. *The Trial Court's Rulings*

In ruling on the defense motion for change of venue, the trial court reviewed the pertinent factors, comparing the case to the then-recent capital case in which this court denied a change of venue, *People v. Coleman* (1988) 48 Cal.3d 112, 133–136 [255 Cal.Rptr. 813, 768 P.2d 32] (*Coleman*). As to the gravity and nature of the offense, the court admitted this factor weighed in favor of the change of venue, given the multiple murders and the "sensational aspects" of the case.

The trial court concluded that the second factor, the nature and extent of the news coverage, did not weigh in favor of a change of venue. There had

been a number of "large and sometimes pictorial and descriptive articles about the murders" between May 22 and June 1, 1990, in the Modesto Bee, the newspaper with the largest circulation in Stanislaus County. There was intensive coverage on local television stations during the same period of time. But that coverage was comparable to that in *Coleman*, i.e., it "quickly subsided" and was not " 'persistent and pervasive' " as in other cases in which a change of venue was warranted. (*Coleman, supra*, 48 Cal.3d at pp. 133, 134.) The trial court found that articles that initially reported neo-Nazi activity and drug use in connection with the case were tempered by later comments by law enforcement officials that the killings were not drug or race related. Moreover, media coverage mentioned defendant by name only once or twice during the news coverage.

The trial court also examined survey data regarding how well acquainted the people of Stanislaus County were with the crime and the defendant. Defendant had submitted a recent telephone poll conducted by private investigator Alan Peacock. According to that survey, 263 out of 400 respondents, approximately two-thirds, had recalled hearing about the killings and 117, or approximately 29 percent, had formed an opinion that the persons arrested for the crimes were guilty. The prosecution, in arguing against the change of venue motion, disputed Peacock's expertise in conducting the survey. The prosecution submitted its own telephone survey, showing that 72 out of 100 respondents could recall hearing something about the case and 21 of those had opinions as to defendant's guilt. The trial court observed that in *Coleman*, only 46 percent had heard of the case, but 31 percent thought the defendant to be guilty, and that this substantial percentage was not by itself grounds for changing venue.

The third factor, the size of the community, also did not weigh in favor of a change in venue. "The size of the community is important because in a small rural community, a major crime is likely to be embedded in the public consciousness more deeply and for a longer time than in a populous urban area." (*Coleman, supra*, 48 Cal.3d at p. 134.) In *Coleman*, we concluded that Sonoma County, with a population of approximately 300,000 in 1980, "[t]hough not one of the state's major population centers, . . . is substantially larger than most of the counties from which this court has ordered venue changes." (*Ibid.*) The trial court in the present case concluded that the size of Stanislaus County, with a population of approximately 370,000 according to the 1990 census, also did not compel a venue change.

The trial court also found the fourth and fifth factors—the status of the defendant and the popularity and prominence of the victim—also did not weigh in favor of the change of venue, as both defendant and the victims were unknown. Based on its assessment of all the above factors, the court

concluded that "there's a reasonable likelihood that [defendant] will receive a fair trial in this County" but that the court reserved final judgment until voir dire revealed the actual state of knowledge of the prospective jury pool.

Defendant renewed the motion for a change of venue on August 22, 1991, after a review of questionnaires completed by the prospective jurors disclosed that approximately two-thirds of the prospective jurors had heard of the case and about 13 percent said they had formed an opinion based on what they had read. The court denied the motion, observing that there was a sufficient number of jurors who had not yet formed opinions.

Defendant again renewed the motion for change of venue on August 26. The defense pointed out that Prospective Juror H., before she was dismissed, had indicated she overheard three persons, perhaps prospective jurors, in the courthouse discussing their belief that appellant should receive the death penalty. Defense counsel argued that this incident underscored the "ominous atmosphere" in which the trial would be taking place. The court affirmed its earlier holding.

Finally, defendant raised the venue issue in his motion for a new trial. Kirk McCallister, specially appointed to represent defendant in the new trial motion, claimed that the pretrial survey of community prejudice conducted by Alan Peacock for previous defense counsel was flawed and that Mr. Peacock lacked professional qualifications. Dr. Stephen Schoenthaler, who had prepared a community prejudice survey for the trial of defendant's codefendants, Cruz, Beck, LaMarsh, and Willey (hereafter the Cruz trial), was called on to testify. The same trial judge who presided over defendant's trial had granted the change of venue in the Cruz trial, which commenced after defendant's trial. Dr. Schoenthaler's survey showed among other things that the percentage of people who had heard of the case and who had formed an opinion of the defendants' guilt—60 percent hearing of the case and 30 percent forming an opinion—was significantly higher in the community prejudice survey than in the pool of prospective jurors and among the actual jurors. Defense counsel argued that it was unrealistic to suppose that of the nine jurors in the case who had prior knowledge of the case, none had formed an opinion.[3]

The trial court denied the motion. It found the greater pretrial publicity in the Cruz trial, as a result of publicity about defendant's trial, justified the

[3] This argument, as formulated in the new trial motion, was flawed for a simple reason. The people polled in the community prejudice survey were randomly chosen whereas the seated jurors were not, and prospective jurors who admitted forming an opinion would not likely have been seated on the jury. The argument has some force, however, when it comes to the entire panel of prospective jurors, in which approximately 13 percent (23 of 173) admitted to forming an opinion, significantly less than the community at large.

change in venue in the former trial. The court also denied the motion "based on actual juror answers to the voir dire [and] the failure to challenge any of them for cause . . . ."

### 3. *Contentions on Appeal*

Defendant claims on appeal that the trial court erred in not initially granting the change of venue motion and not granting a new trial based on the failure to change venue. In making these arguments, he compares this case to *Williams, supra,* 48 Cal.3d 1112, a capital case in which we reversed the judgment due to the court's failure to grant the change of venue motion. Defendant makes several arguments based on the notoriety of the case. First, approximately 66 percent of prospective jurors had heard of the case, as opposed to 52 percent in the *Williams* case. Second, nine of 12 seated jurors had heard of the case, as compared to eight of 12 in *Williams*. (*Williams, supra,* 48 Cal.3d at p. 1128.) The newspaper reports in *Williams* were "frequently sensational," describing the victim's " 'bullet-riddled body' " several times. Coverage of the quadruple murder, defendant argues, was also frequently sensational, or at least likely to leave an impression on the reader, with a number of front page and lead articles. The articles referred to the defendants as part of a Nazi or White supremacist organization. One article in the Modesto Bee, on the front page of the "B" Metro section, reported on the preliminary hearing six months before trial, recounting defendant's description to Detective Deckard of how he had "nearly cut off the head of Emmie Paris." The confession was later suppressed as the product of an illegal interrogation. Press coverage of incriminating evidence later deemed inadmissible was also found significant in *Williams*. (48 Cal.3d at p. 1127.)

Defendant also claims that the extent of community prejudice may be gauged by the comments and behavior of some of the excused jurors who had overheard or had discussed the case and been exposed to the view that defendant was guilty. Defendant further points to the fact that he exhausted all 20 of his peremptory challenges, whereas the failure to do so would lead to the inference that the defense is satisfied with the jury. (See *People v. Dennis* (1998) 17 Cal.4th 468, 524 [71 Cal.Rptr.2d 680, 950 P.2d 1035]; *People v. Daniels* (1991) 52 Cal.3d 815, 853–854 [277 Cal.Rptr. 122, 802 P.2d 906].)

There are nonetheless significant differences between *Williams* and the present case that undermine defendant's position. Of great significance in *Williams* was the size of Placer County, which at the time of trial had a population of 117,000. (*Williams, supra,* 48 Cal.3d at p. 1126.) As noted, Stanislaus County had at the time of trial a population over three times greater, including the city of Modesto with 80,000. The small size of the

community in *Williams* was reflected in the fact that over one-third of the number of potential jurors knew people connected to the case, including the victim, members of her family, and the district attorney or investigators, which was not the case here. (*Id.*, at p. 1130.)

Moreover, although there was a flurry of publicity around the time of the murders, and some prejudicial articles around the time of the preliminary hearing in defendant's case, six months prior to trial, in *Williams* "the publicity did not cease but continued at a fairly steady pace until the start of trial." (*Williams*, *supra*, 48 Cal.3d at pp. 1127–1128.) We also found important in *Williams* the status of the defendant and the victim: the victim was a White woman whose family had " 'prominence in the community,' " whereas the defendant was from Sacramento, an outsider, and a Black man in a county with less than 1 percent Blacks, resulting in "social, racial and sexual overtones." (*Williams*, *supra*, 48 Cal.3d at p. 1129.) In such circumstances, "the risk is enormously high that the verdict may be based on a desire for revenge, or the fear of social ostracism as the cost of a mitigated verdict." (*Id.* at p. 1131.) There were no such overtones in the present case, and although defendant characterizes the victims, especially Emmie Paris, as a "posthumous celebrity" (*Odle v. Superior Court* (1982) 32 Cal.3d 932, 940 [187 Cal.Rptr. 455, 654 P.2d 225]), this case does not present the situation of an outsider defendant against a victim with "long and extensive ties to the community."[4] (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 46 [17 Cal.Rptr.3d 710, 96 P.3d 30] [distinguishing *Williams* on similar grounds].)

In sum, our independent review of the record in light of the relevant factors discussed above does not support defendant's contention that the trial court abused its discretion in denying the change of venue motion.[5]

---

[4] Defendant also argues that the Schoenthaler survey placed the percentage of the community that had prejudged the case at 46 percent, more than the 29 percent in the earlier Peacock survey that had been found to have judged the defendants guilty, on which the trial court's decision was partly based. The 46 percent figure, however, is misleading. That figure comprises a percentage of eligible jurors surveyed who prejudged the case because they either (1) were categorically against the death penalty; or (2) had formed an opinion that if defendants were guilty, they should get the death penalty; or (3) had formed the opinion that defendants were guilty. But the first two categories are not pertinent to a change in venue motion. As noted, the Schoenthaler survey reported 30 percent of eligible juror respondents had prejudged defendants' guilt, a figure virtually equal to the finding of the Peacock survey.

[5] One shortcoming in the voir dire proceeding, which was conducted exclusively by the trial judge, appears in the record. As noted above, nine of 12 jurors indicated some familiarity with the case in their questionnaires. The questionnaires asked what details of the case the jurors remembered but a number of jurors did not indicate the extent to which they were familiar with the case, stating only that they "read about it" in the newspaper. The trial court did not voir dire the jurors on the subject of their knowledge and whether they had formed an opinion. Although the jurors professed in their questionnaires not to have formed an opinion, "[a]

### B. *Voir Dire on Multiple Murder*

Prior to the commencement of voir dire, defense counsel submitted a proposed jury questionnaire that contained the following question: "Do you feel you would automatically vote for death instead of life imprisonment with no parole if you found the defendant guilty of two or more murders?" The prosecution objected that the subject areas "should be covered by the Court" in its death qualification voir dire. Defense counsel stated that he appreciated that "the Court would be doing the questioning in all aspects on [death qualification voir dire], but I think the Court will need something to get started on to get an idea of . . . what questions to ask that would intelligently bring out" prospective jurors' views on the death penalty. The question was not included in the jury questionnaire. Moreover, the judge's questions to prospective jurors did not ask this or a similar question.[6] Defendant claims error for refusing his request to inquire into the ability of prospective jurors to vote for life imprisonment without parole in the case of multiple murder convictions. More specifically, he contends reversal of the penalty phase judgment is compelled by our holding in *People v. Cash* (2002) 28 Cal.4th 703, 718–723 [122 Cal.Rptr.2d 545, 50 P.3d 332] (*Cash*). He further claims that these errors violated his rights to equal protection, due process, a fair jury trial and protection against cruel and unusual punishment found in the United States and California Constitutions. (U.S. Const., 5th, 6th, 8th, & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 17.) We conclude there was no error.

In *Cash* the defense, anticipating that the prosecution would introduce into aggravation the defendant's murder of his elderly grandparents at age 17,

juror's declaration of impartiality . . . is not conclusive." (*Williams, supra,* 48 Cal.3d at p. 1129.)

■ As we stated in *People v. Jennings* (1991) 53 Cal.3d 334, 360 [279 Cal.Rptr. 780, 807 P.2d 1009]: "[W]e examine 'the voir dire of prospective and actual jurors to determine whether pretrial publicity did in fact have a prejudicial effect.'" The lack of such voir dire in this case is therefore troubling, particularly in light of the fact that prospective jurors indicated in preliminary questionnaires that they had heard of the case. Given the totality of the circumstances, however—the sporadic nature of the pretrial publicity, the fact that the jurors professed to form no opinion, and the other factors discussed above—it does not appear the trial court's failure to engage in this kind of voir dire led to an erroneous denial of the voir dire request.

[6] A typical death qualification voir dire asked the following five questions:

"BY THE COURT: Q. Mrs. B., do you have any feelings about the death penalty which are so strong that you would never find a person guilty of first degree murder?

"Q. Do you have any feelings about the death penalty which are so strong that you would never find a special circumstance to be true?

"Q. Do you have any feelings about the death penalty which are so strong that you would never vote to impose the death penalty where it was a possible sentence?

"Q. Do you have any feelings about the death penalty which are so strong that you would always impose the death penalty in any case you had the opportunity?

"Q. Do you have any feelings about the death penalty which in your mind would substantially interfere with your ability to act as a juror?"

attempted to ask a prospective juror during voir dire whether there were " 'any particular crimes' " which would have caused the juror " 'automatically to vote for the death penalty.' " (*Cash, supra,* 28 Cal.4th at p. 719.) The trial court ruled the question improper, and also denied a subsequent motion to ask prospective jurors whether there were any aggravating circumstances that would cause them to automatically vote for the death penalty. (*Ibid.*)

We held the trial court erred. We began our analysis with an articulation of the basic principles of voir dire in capital cases: "Prospective jurors may be excused for cause when their views on capital punishment would prevent or substantially impair the performance of their duties as jurors. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844].) 'The real question is " ' "whether the juror's views about capital punishment would prevent or impair the juror's ability to return a verdict of death *in the case before the juror.*" ' " ' [Citations.] Because the qualification standard operates in the same manner whether a prospective juror's views are for or against the death penalty (*Morgan v. Illinois* (1992) 504 U.S. 719, 726–728 [119 L.Ed.2d 492, 112 S.Ct. 2222]), it is equally true that the 'real question' is whether the juror's views about capital punishment would prevent or impair the juror's ability to return a verdict of life without parole in the case before the juror." (*Cash, supra,* 28 Cal.4th at pp. 719–720.)

We therefore found error in the trial court's refusal of the defense's proposed voir dire: "[T]he trial court's ruling prohibited defendant's trial attorney from inquiring during voir dire whether prospective jurors would automatically vote for the death penalty if the defendant had previously committed another murder. Because in this case defendant's guilt of a prior murder (specifically, the prior murders of his grandparents) was a general fact or circumstance that was present in the case and that could cause some jurors invariably to vote for the death penalty, regardless of the strength of the mitigating circumstances, the defense should have been permitted to probe the prospective jurors' attitudes as to that fact or circumstance. In prohibiting voir dire on prior murder, a fact likely to be of great significance to prospective jurors, the trial court erred." (*Cash, supra,* 28 Cal.4th at p. 721.)

Of particular importance for the present case was *Cash*'s discussion of *People v. Medina* (1995) 11 Cal.4th 694, 745–746 [47 Cal.Rptr.2d 165, 906 P.2d 2]. "In *Medina,* on which the Attorney General particularly relies, the trial court initially declined to permit voir dire on whether prospective jurors could vote for life imprisonment if the defendant had committed multiple murders, but later the trial court changed its ruling and allowed such questioning. Despite dictum expressing doubt that the court's initial ruling was incorrect, we held that the initial ruling did not prejudice the defendant because 'after the trial court clarified its position with respect to the multiple

murder question, defendant failed to ask to reexamine any juror on this topic.' (*People v. Medina, supra,* 11 Cal.4th at p. 746.) Here, by contrast, the trial court never altered its erroneous ruling, and defendant had no opportunity to reexamine any juror with respect to the prior murder question." (*Cash, supra,* 28 Cal.4th at p. 722.)

As our discussion of *Medina* in *Cash* suggests, a trial court's categorical prohibition of an inquiry into whether a prospective juror could vote for life without parole for a defendant convicted of multiple murder would be error. Multiple murder falls into the category of aggravating or mitigating circumstances "likely to be of great significance to prospective jurors." (*Cash, supra,* 28 Cal.4th at p. 721.) The Attorney General does not dispute this point.[7] Rather, the Attorney General argues that defendant was not denied the opportunity to conduct voir dire on the subject of multiple murder. We agree.

Although the trial court did not include the sought-after question on multiple murder in the jury questionnaire, it never suggested that defense counsel could not raise the issue in voir dire. The trial court never ruled that the question was inappropriate, and the prosecutor did not object to the question itself, but only opined that the question was "probably better asked by the court." To be sure, as discussed more fully in the next part of this opinion, the trial court conducted voir dire by itself and for the most part did not allow counsel to directly question prospective jurors. But the trial court made clear that it would permit on voir dire "supplemental questions that I would ask if you ask me to ask." Defense counsel never suggested to the court that it voir dire on the subject of multiple murder. The court presented the questions he planned to ask prospective jurors regarding the death penalty and defense counsel stated that he had "no legal objections."

Defendant contends on appeal that the trial court's invitation to ask supplemental questions "was clearly for the limited purpose of allowing the attorneys to suggest clarifying questions with respect to certain individual jurors, not an invitation for counsel to suggest additional general questions to be directed to the full jury panel." But the record belies that contention. The trial court incorporated into its general voir dire, for example, a question suggested by the prosecution informing prospective jurors that the prosecution would be calling a witness who had entered into a plea bargain and inquiring whether they believed plea bargaining to be improper. Whether or

---

[7] The Attorney General argued in the respondent's brief, filed before we issued our opinion in *Cash,* that *Medina* made clear the trial court is not required to permit defense counsel inquiry into prospective jurors' views on the death penalty for multiple murderers. In supplemental briefing filed at our request, the Attorney General does not dispute defendant's contention that denying the opportunity to voir dire the jury on this subject is contrary to our holding in *Cash* and would violate a defendant's Fourteenth Amendment right to an impartial jury.

not the trial court would have approved an additional general question on voir dire asking about juror's attitudes toward multiple murderers is unclear. What is clear is that defendant did not request such a question. Nor does he contend the trial court had a sua sponte duty to ask the question on voir dire merely because it was informed that defense counsel desired such a question be included in the questionnaire.

Thus, the question is not, as defendant contends, whether his claim of *Cash* error was properly preserved, but rather whether any error was committed. Although asking the multiple-murder question in the jury questionnaire would not have been improper, refusal to include the question was not error so long as there was an opportunity to ask the question during voir dire. Because defendant did not attempt to have the trial court conduct a multiple murder inquiry during voir dire, and the trial court was given no opportunity to rule on the propriety of that inquiry, we conclude defendant cannot claim error. (See *Cash, supra,* 28 Cal.4th at p. 722; *People v. Medina, supra,* 11 Cal.4th at p. 746.)

### C. *Failure to Conduct Individual Death Qualification Voir Dire*

Defendant claims the trial court erred in conducting group voir dire, particularly death-qualification voir dire, thereby violating his constitutional rights to due process, an impartial jury and to be free of cruel and unusual punishment. (U.S. Const., 5th, 6th, 8th, & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 17.) We conclude no error was committed.

In *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301], we held that "[i]n order to minimize the potentially prejudicial effects [of open-court voir dire], this court declares, pursuant to its supervisory authority over California criminal procedure, that in future capital cases that portion of the voir dire of each prospective juror which deals with issues which involve death-qualifying the jury should be done individually and in sequestration." (Fns. omitted.) In *People v. Waidla* (2000) 22 Cal.4th 690, 713–714 [94 Cal.Rptr.2d 396, 996 P.2d 46], we recognized that our holding in *Hovey* had been abrogated by Code of Civil Procedure section 223, part of Proposition 115 enacted by the voters in 1990. That section provides in pertinent part that in criminal cases, "including death penalty cases," "[v]oir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors." (Code Civ. Proc., § 223.)

Defendant argues that Code of Civil Procedure section 223 is unconstitutional because *Hovey*'s requirement of individual death qualification, which this court has not overruled, is constitutionally based. He is incorrect. "In *Hovey* . . . we clearly indicated that we adopted the rule pursuant to our

supervisory authority over California criminal procedure and not under constitutional compulsion, and that we did so because the prejudicial effects associated with death-qualifying voir dire in open court had not been shown to be actual but only potential." (*People v. Anderson* (1987) 43 Cal.3d 1104, 1135 [240 Cal.Rptr. 585, 742 P.2d 1306].)

■ Further, defendant contends that Code of Civil Procedure section 223 did not overrule *Hovey* because it did not refer to that case, and because its caveat that group voir dire take place "where practicable" can be taken as a codification of *Hovey*. This was essentially the argument made by the defendant in *Covarrubias v. Superior Court* (1998) 60 Cal.App.4th 1168 [71 Cal.Rptr.2d 91]. The court in *Covarrubias* examined at length the language, purpose and ballot arguments behind Proposition 115 and concluded that "section 223 was intended to overrule *Hovey*'s holding that individual sequestered voir dire is required during death qualification." (*Covarrubias, supra*, 60 Cal.App.4th at p. 1178.) We endorsed *Covarrubias*'s holding in *People v. Waidla, supra*, 22 Cal.4th at pages 713–714, and do so again here.

■ Finally, defendant claims that voir dire in his case was not "practicable" within the meaning of Code of Civil Procedure section 223. "[S]ection 223 vests the trial court with discretion to determine the advisability or practicability of conducting voir dire in the presence of the other jurors." (*Covarrubias v. Superior Court, supra*, 60 Cal.App.4th at p. 1184.) A trial court that altogether fails to exercise its discretion to determine the practicability of group voir dire has not complied with its statutory obligation. (*Ibid.*) Our cases have suggested that group voir dire may be determined to be impracticable when, in a given case, it is shown to result in actual, rather than merely potential, bias. (See *People v. Anderson, supra*, 43 Cal.3d at p. 1135.)

Defendant contends there was such indication of actual bias in the group voir dire process in the present case. In defendant's new trial motion, and again here on appeal, defendant points to the voir dire of two prospective jurors, Robert C. and Henry E., who answered affirmatively when asked "[a]re your feelings about the death penalty such that in every case in which you have the opportunity to impose the death penalty you would impose it?" In both cases, the trial court responded in ways that indicated the answers were inappropriate and not in conformity with the law. Defendant notes prospective jurors on the same panel whose voir dire followed Robert C. and Henry E. did not give the same unqualified affirmative response to that question. He surmises that these prospective jurors, including several persons who were seated as jurors on the case, were influenced by the trial court's responses to Robert C. and Henry E. and gave answers that conformed to law but may have been untruthful, i.e., they understated their pro-death-penalty bias. Defendant in the new trial motion sought to bolster this argument with

testimony from Dr. Schoenthaler concerning the Hawthorne effect, a phenomenon observed in social science research whereby the act of observation changes the behavior of the subjects observed, as when research subjects change their behavior to conform to what they perceive as the expectations of the researchers. (See Risinger et al., *The Daubert/Kumho Implications of Observer Effects in Forensic Science: Hidden Problems of Expectation and Suggestion* (2002) 90 Cal. L.Rev. 1, 20, fn. 90.)

At the threshold, the Attorney General claims that defendant did not object below to group voir dire and the issue is waived. It appears that defense counsel objected to the repetitive questioning of the death-qualification voir dire, because "I think . . . it's creating . . . an atmosphere of guilt and death." Defense counsel did not, however, propose individual, sequestered voir dire as a solution to this perceived problem, but rather sought to have the trial court conduct death-qualification voir dire only when prospective jurors' attitudes toward the death penalty, as expressed in the questionnaire, were unclear. Defendant did not raise the issue of individual voir dire until his motion for a new trial. Defendant's claim is therefore not preserved on appeal.

█ Even if it were, it is without merit. The possibility that prospective jurors may have been answering questions in a manner they believed the trial court wanted to hear identifies at most potential, rather than actual, bias and is not a basis for reversing a judgment. The trial court did not abuse its discretion in proceeding with group voir dire.

### III. GUILT PHASE ISSUES

#### A. *Refusal of Duress Instruction*

Defense counsel requested the following instruction, which the trial court refused to give: "If the defendant agreed and participated in the plan [to commit murder] in the honest belief that his life or physical safety was in danger if he did not agree and participate, he would not act with malice and could not be guilty of conspiracy to commit murder." Defendant contended, and contends now, that the evidence supported such an instruction and that the trial court therefore erred in refusing to give it. We consider in turn each of the two parts of the instruction, i.e, whether in the present case the defense of duress can negate malice and whether it can be a defense to conspiracy to commit murder.

##### 1. *Duress and Malice*

█ Penal Code section 26 declares duress to be a perfect defense against criminal charges when the person charged "committed the act or made the

omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused." That section also provides that this defense does not apply to crimes "punishable with death." We recently rejected the argument that duress could negate the elements of malice or premeditation, thereby reducing a first degree murder to manslaughter or second degree murder. (*People v. Anderson* (2002) 28 Cal.4th 767, 781–784 [122 Cal.Rptr.2d 587, 50 P.3d 368].) We decline defendant's invitation to reconsider the holding in *Anderson*. Moreover, because duress cannot, as a matter of law, negate the intent, malice or premeditation elements of a first degree murder, we further reject defendant's argument that duress could negate the requisite intent for one charged with aiding and abetting a first degree murder. (See *Anderson, supra*, 28 Cal.4th at p. 784.)

## 2. *Conspiracy to Commit Murder*

Defendant contends that although duress may not be a defense to murder, it is a defense to a conspiracy to commit murder. Even assuming he is correct, the trial court committed no error, because the facts did not support a duress instruction. (*People v. Flannel* (1979) 25 Cal.3d 668, 684–685 [160 Cal.Rptr. 84, 603 P.2d 1] [trial court obliged to instruct on a defense theory only when there is substantial evidence to support].)

■ "The common characteristic of all the decisions upholding [a duress defense] lies in the immediacy and imminency of the threatened action: each represents the situation of a present and active aggressor threatening immediate danger; none depict a phantasmagoria of future harm." (*People v. Otis* (1959) 174 Cal.App.2d 119, 125 [344 P.2d 342]; see also *People v. Bacigalupo* (1991) 1 Cal.4th 103, 125 [2 Cal.Rptr.2d 335, 820 P.2d 559].) In arguing that the evidence supports a duress instruction, defendant points to testimony of Michelle Evans that Cruz had told defendant and the others in the group, in their meeting just before they went off to commit the murders, that if any one of them "messed up" during the attack on Raper, that person would "join" the intended murder victims. Evans testified that Cruz looked directly at defendant when he made that threat. Evans also testified, as recounted above, that Cruz had ordered defendant beaten and tortured on several occasions.

We disagree that substantial evidence supports a duress instruction in the present case. Rather, the evidence points strongly to the fact that defendant's participation in the murders was not principally motivated by a fear for his life, but rather stemmed from his belief in Cruz as a figure of authority. Defendant's behavior immediately after the murder plan had been formulated (swinging a bat and dancing around to rock music), his energetic participation

in carrying out the murder plan, and his subsequent statements to Detective Deckard and Mary Gardner that he condoned the murders and that the victims deserved to die, are not consistent with a defense that he was compelled to commit the murders by an immediate and imminent threat to his life. Nor did defendant hint in his conversations with Deckard, Gardner or Evans in the immediate aftermath of the murders that fear for his life was a primary motive. While the fact that defendant was dominated by Cruz is, as discussed below, a factor the jury could consider at the penalty phase of the trial, it did not constitute duress within the meaning of section 26. The defense of duress was therefore not available to defendant as to any crime.[8]

Defendant also claims that a sentence of death for someone who committed a murder under duress would constitute cruel and unusual punishment in violation of the United States and California Constitutions (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17) because such an outcome would impose a "penalty '. . . so *disproportionate* to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*People v. Frierson* (1979) 25 Cal.3d 142, 183 [158 Cal.Rptr. 281, 599 P.2d 587].) We need not decide whether an individual who kills because he faces the imminent choice between taking a life or likely forfeiting his own can be constitutionally sentenced to death. As explained immediately above, that is not this case.

## B. *Exclusion of Cult Expert Testimony*

Defendant contends the trial court erred in refusing to admit at the guilt phase the testimony of Randy Cerny. Cerny was a former Stanislaus County Sheriff's detective who specialized in the study of cults. Defense counsel offered Cerny's testimony to establish that defendant, under the mind control techniques of Cruz, was unable to form the mental state required for first degree murder. The trial court excluded Cerny's testimony because he was not a qualified expert on whether defendant had a "mental defect, mental disorder, or mental disease" at the time he committed the murders. Defendant claims the trial court erred, and that the error deprived him of his rights to due process and compulsory process under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. We conclude there was no error.

---

[8] Trial counsel himself came to recognize the inappropriateness of a duress defense at the guilt phase. When discussing the modification of the duress instruction, he stated: "I tend to agree that the state of the evidence that [the prosecutor] alluded to earlier would not permit a logical argument to the jury that [defendant] was in imminent fear of his life in the first place."

 A trial court's decision to admit or exclude evidence is reviewable for abuse of discretion. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10 [82 Cal.Rptr.2d 413, 971 P.2d 618].) No such abuse occurred here. "Expert opinion on whether a defendant had the capacity to form a mental state that is an element of a charged offense or actually did form such intent is not admissible at the guilt phase of a trial. [Citation.] Sections 28[9] and 29[10] permit introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but do not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state." (*People v. Coddington* (2000) 23 Cal.4th 529, 582 [97 Cal.Rptr.2d 528, 2 P.3d 1081], fns. omitted, overruled on another point by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].) Here, the trial court concluded that Cerny, who was not a psychologist or a psychiatrist, was not qualified to render an opinion as to whether defendant suffered from a mental illness at the time he committed the murders that would raise a doubt about whether defendant had the mental state requisite for first degree murder; nor was Cerny qualified to testify generally about the relationship between mental illness and certain types of behavior. (See *Coddington,* at pp. 582–583.) We conclude the trial court did not abuse its discretion in determining that Cerny's testimony was not relevant to any guilt phase issue and should be excluded.

## C. *Admission of Photographs*

Before trial, defense counsel moved in limine to exclude "the gruesome photographs of the injuries to Darlene Paris." Counsel argued the photographs should be excluded under Evidence Code section 352, because their

---

[9] Section 28 states: "(a) Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged. [¶] (b) As a matter of public policy there shall be no defense of diminished capacity, diminished responsibility, or irresistible impulse in a criminal action or juvenile adjudication hearing. [¶] (c) This section shall not be applicable to an insanity hearing pursuant to Section 1026. [¶] (d) Nothing in this section shall limit a court's discretion, pursuant to the Evidence Code, to exclude psychiatric or psychological evidence on whether the accused had a mental disease, mental defect, or mental disorder at the time of the alleged offense."

[10] Section 29 states: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

prejudicial effect was considerable and their probative value slight, and because there was "no issue of the cause of the death of any of the victims or the location or extent of their wounds." The trial court did exclude some of the challenged photographs, but allowed the admission of two that defendant now claims were admitted in error. The first, People's exhibit No. 46, showed a picture of Raper's skull, which, as the prosecutor described it, looked "much like . . . a hard-boiled egg shown after it cracked." The second, People's exhibit No. 57, showed a view of Paris's slashed throat. Defendant now contends this was error, under Evidence Code section 352 and the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

The Attorney General argues that exhibit No. 57, by showing the extent of the wounds inflicted on Paris, and her near decapitation, graphically undermined defendant's defense that he did not intend any killing and did not act with malice or premeditation. We agree the trial court did not abuse its discretion in admitting that photograph and committed neither statutory nor constitutional error.

As for exhibit No. 46, defendant did not object to admission of the photograph, and his claim of error is therefore forfeited. Even if an objection had been made, no reversal is warranted. The rules governing the admissibility of photographic evidence are settled: all relevant evidence is admissible, unless excluded under the federal or state Constitution or by statute, and trial courts have broad discretion in determining the relevance of evidence but lack discretion to admit irrelevant evidence. (*People v. Scheid* (1997) 16 Cal.4th 1, 13–14 [65 Cal.Rptr.2d 348, 939 P.2d 748], and cases cited therein.) Photographs of a murder victim "are always relevant to prove how the charged crime occurred, and the prosecution is 'not obliged to prove these details solely from the testimony of live witnesses,' " even in the absence of a defense challenge to particular aspects of the prosecution's case. (*People v. Pollock* (2004) 32 Cal.4th 1153, 1170 [13 Cal.Rptr.3d 34, 89 P.3d 353]; see *People v. Scheid, supra,* 16 Cal.4th at p. 15.) We are not prepared to say, after examining the subject photograph of Raper's skull, that the trial court abused its broad discretion in implicitly concluding its probative value outweighed its prejudicial effect. Even were we to assume the contrary, we would find admission of the photograph harmless given the strength of the evidence of defendant's participation in the four murders. (See *People v. Weaver* (2001) 26 Cal.4th 876, 933–934 [111 Cal.Rptr.2d 2, 29 P.3d 103].)

### D. *Cumulative Error*

Because we find no valid claim of error on appeal, we reject defendant's contention that his guilt phase judgment must be reversed for cumulative error.

### IV. SPECIAL CIRCUMSTANCES/DEATH ELIGIBILITY ISSUES

### A. *Multiple-murder Special Circumstance*

Defendant claims that the multiple-murder special circumstance violates his Eighth Amendment rights because it fails to adequately narrow the class of murderers who are eligible for the death penalty. We have rejected this argument. (*People v. Coddington, supra,* 23 Cal.4th at p. 656; see also *Lowenfield v. Phelps* (1988) 484 U.S. 231, 246 [98 L.Ed.2d 568, 108 S.Ct. 546].) Defendant advances no persuasive reason to reconsider our position.

### B. *Conspiracy to Commit Murder Alone Cannot Make Defendant Death Eligible*

Defendant contends the trial court erred in imposing a separate death sentence upon him for conspiracy to commit murder. As the Attorney General concedes, defendant is correct, and we have held that conspiracy to commit murder is not a death-eligible crime. (*People v. Lawley* (2002) 27 Cal.4th 102, 171–172 [115 Cal.Rptr.2d 614, 38 P.3d 461].) As in *Lawley*, "[u]nder our statutory power to modify an unauthorized sentence (see § 1260), we shall direct the trial court to issue an amended abstract of judgment reflecting the appropriate sentence for conspiracy to commit murder, which the Attorney General in this case agrees is imprisonment for 25 years to life . . . ." (*Id.* at pp. 171–172, fn. omitted.)

### V. THE PENALTY PHASE

### A. *Sustaining Objection to Defendant's Mother's Remark*

At the penalty phase, the defense called defendant's mother, Barbara Vieira, to testify on his behalf. Toward the end of defense counsel's direct examination, he asked her: "What would [your son's] death do to you?" She replied: "His death would destroy me." The prosecution moved to strike her remark and the trial court sustained the motion. Defendant now claims the trial court in so doing committed prejudicial error and violated defendant's Eighth Amendment right to present mitigating evidence.

■ A statement about how a defendant's death would make the family member suffer is not relevant to an individualized determination of defendant's culpability and may be properly excluded. (*People v. Sanders* (1995) 11 Cal.4th 475, 546 [46 Cal.Rptr.2d 751, 905 P.2d 420].) As we stated in *Sanders*: "The specific questions whether family members would prefer that defendant not be executed or believe that a death sentence will stigmatize them are not, however, strictly relevant to the defendant's character, record, or individual personality." (*Ibid.*) As we further clarified in *People v. Ochoa* (1998) 19 Cal.4th 353, 456 [79 Cal.Rptr.2d 408, 966 P.2d 442]: "A defendant may offer evidence that he or she is loved by family members or others, and that these individuals want him or her to live. But this evidence is relevant because it constitutes indirect evidence of the defendant's character. The jury must decide whether the defendant deserves to die, not whether the defendant's family deserves to suffer the pain of having a family member executed."

In the present case, Barbara Vieira's statement went beyond the expression of her desire that defendant be spared the death penalty, which would have been permissible character evidence, and spoke directly of the impact the execution would have on her. Although the question is close, we conclude the trial court did not abuse its discretion in striking her testimony. Moreover, even if it was error, the error was harmless. It is evident that Barbara Vieira communicated to the jury, by the whole of her testimony, that she loved and valued her son and that his crimes were the result of his association with Cruz and his followers. Her statement that his death would destroy her would not have significantly added to the jury's picture of defendant's character. (See *People v. Heishman* (1988) 45 Cal.3d 147, 194 [246 Cal.Rptr. 673, 753 P.2d 629].)

### B. *Prosecutorial Misconduct During Penalty Phase Closing Argument*

Defendant claims three instances of prosecutorial misconduct during the penalty phase, each of which he claims violated his Eighth Amendment right to a fair determination at the penalty phase. These instances will be considered in turn.

#### 1. *Commenting on Defendant's Lack of Remorse*

■ During closing argument, the prosecutor commented briefly on defendant's lack of remorse. Defendant contends that such comment allowed the prosecutor to argue a nonstatutory aggravating factor, lack of remorse, in contravention of the death penalty statute. (See *People v. Boyd* (1985) 38 Cal.3d 762, 772–776 [215 Cal.Rptr. 1, 700 P.2d 782].) We have held that such comment is not misconduct when the prosecution calls to the jury's attention that the mitigating factor of remorse is not present, so long as the

prosecution does not comment on the defendant's failure to testify at the penalty phase. (*People v. Crittenden* (1994) 9 Cal.4th 83, 147–148 [36 Cal.Rptr.2d 474, 885 P.2d 887].) In the present case, the prosecutor did not suggest lack of remorse could be used as an aggravating factor and did not comment on defendant's silence at the penalty phase. Nor could the prosecutor's argument be properly characterized as committing *Davenport* error, i.e., arguing lack of mitigation as an aggravating factor (*People v. Davenport* (1985) 41 Cal.3d 247, 288–290 [221 Cal.Rptr. 794, 710 P.2d 861]); see *Crittenden, supra,* 9 Cal.4th at pp. 148–149.) We therefore conclude the prosecutor did not commit misconduct in this instance.

### 2. *Statement Regarding Mercy for Defendant*

■ The prosecutor told the jury that under section 190.3, factor (k), the jury could consider sympathy and mercy for defendant in determining the appropriate penalty. The prosecutor then added: "I'd be happy if you show [defendant] that exact same mercy and sympathy that he showed those people on Elm Street that night. It's absolutely none." Defendant contends this was misconduct. But as we have held, it is proper for the prosecutor to argue, based on the evidence, that a capital defendant does not deserve sympathy. (*People v. Ochoa, supra,* 19 Cal.4th at pp. 464–465.) The prosecutor did no more than this.

### 3. *Prosecutor's Statements Regarding the Bible and Philosophical Writings*

Defendant contends that the prosecutor committed misconduct by referring to the Bible and religion in order to persuade the jury to sentence defendant to death. In particular, defendant points to the following, delivered somewhere in the middle of the prosecutor's argument:

"Something I want to touch on. And I want to tell you this is not an aggravating factor. I only bring up the subject in the event any of you have any reservations about it, then hopefully I can . . . help with that.

"That's the subject of religion. This is not aggravating at all. People from time to time have a problem because they say, 'Gee, in the Bible it says "Thou shall not kill," and "Vengeance is mine sayeth the Lord. I will repay." ' That's found in Romans. But in the very next passage . . . , it goes on and calls for capital punishment and says, '[t]he ruler bears not the sword in vain for he is the minister of God, a revenger to execute wrath upon him that doeth evil.' He's talking about the ruler, the government, whatever.

"Now, the Judeo-Christian ethic comes from the Old Testament—I believe the first five books—called the Torah in the Jewish religion. And there are two very important concepts that are found there. And that's, one, capital punishment for murder is necessary in order to preserve the sanctity of human life, and, two, only the severest penalty of death can underscore the severity of taking life.

"The really interesting passage is in Exodus, chapter 21, verses 12 to 14: 'Whoever strikes another man and kills him shall be put to death. But if he did not act with intent but they met by act of God, the slayer may flee to a place which I will appoint for you.' Kind of like life without possibility of parole, haven, sanctuary. 'But if a man has the presumption to kill another by treachery, you shall take him even from my altar to be put to death.' There is no sanctuary for the intentional killer, according to the Bible.

"Now, I'll leave it at that. That was just in the event any of you have any reservations about religion in this case."

We recently considered a very similar prosecutorial argument in *People v. Slaughter* (2002) 27 Cal.4th 1187, 1208–1209 [120 Cal.Rptr.2d 477, 47 P.3d 262]. We held this line of argument to be improper (*id.* at p. 1209), but nonetheless upheld the defendant's death sentence for several reasons. First, we noted that the defendant had forfeited the issue by failing to object at trial. (*Ibid.*) Second, we held that such forfeiture did not necessarily constitute ineffective assistance of counsel, reaffirming that " ' "[t]he choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal." ' " (*Id.* at p. 1210.)

Third, we held the prosecutor's misconduct to be nonprejudicial. After reviewing our case law on this issue, we stated: "Biblical references that rival in length those in the present case were found harmless in *People v. Wash* [(1993)] 6 Cal.4th 215, 261 [24 Cal.Rptr.2d 421, 861 P.2d 1107], because after making the biblical references, 'the prosecutor embarked upon a lengthy and detailed argument devoted exclusively to the evidence in aggravation . . . . He did not return to the subject of God or religion, but instead urged a sentence of death based upon defendant's moral culpability for the crimes in light of the statutory factors. Thus, we do not believe the objectionable remarks could reasonably have diminished the jury's sense of responsibility, or displaced the court's instructions. [Citation.] There is no possibility that the jury would have reached a more favorable verdict had the misconduct not

occurred. [Citation.]' [¶] The same is true in the present case. The prosecutor's biblical references during his penalty phase argument were improper but harmless." (*People v. Slaughter, supra,* 27 Cal.4th at p. 1211.)

The same can be said in the present case. Defense counsel did not object to the prosecution's biblical argument, and we cannot say from an examination of the appellate record that the lack of objection constitutes ineffective assistance of counsel. Moreover, the biblical argument quoted above was only a small part of a prosecutorial argument that primarily focused on explaining to the jury why it should conclude that the statutory aggravating factors outweighed the mitigating factors. We therefore conclude that the misconduct was not prejudicial.[11]

Defendant also claims prosecutorial misconduct in the prosecutor's quotation of Lord Denning,[12] which he identified to the jury as a judge "in the old Court of Appeal in England." That quotation, as stated by the prosecutor, was as follows: "Punishment is the way in which society expresses its denunciation of wrongdoing. In order to maintain respect for the law, it is essential that the punishment inflicted for grave crimes should adequately reflect the revulsion felt by the great majority of citizens for them. It is a mistake to consider the objects of punishment as being deterrent or reformative or preventive and nothing else . . . . The truth is that some crimes are so outrageous that society insists on adequate punishment because the wrongdoer deserves it, irrespective of whether it is a deterrent or not."

There was no misconduct. The prosecutor in this case merely asked the jury to make the individualized determination that this defendant deserved death for these crimes because they were particularly outrageous, regardless of whether or not his execution would deter other crimes. There was no likelihood the argument would have obscured the jury's proper understanding of its role at the penalty phase.

---

[11] We note that our statements clearly condemning prosecutorial reliance on biblical authority in penalty phase closing argument were made in a series of cases filed in late 1992 and 1993. (See *People v. Wash, supra,* 6 Cal.4th at pp. 260–261; *People v. Sandoval* (1992) 4 Cal.4th 155, 193–194 [14 Cal.Rptr.2d 342, 841 P.2d 862]; *People v. Wrest* (1992) 3 Cal.4th 1088, 1107 [13 Cal.Rptr.2d 511, 839 P.2d 1020].) The prosecutor's 1991 closing argument predated these decisions. We do not decide whether prosecutorial biblical argument that postdates and deliberately contravenes the holdings in those decisions constitutes a more serious form of prosecutorial misconduct warranting reversal of the penalty phase judgment.

[12] In the transcript and in the briefs, the name is spelled Lord "Dinning," but apparently refers to Lord Alfred Thompson Denning, who served on the English Court of Appeal, between 1944 and 1982, 20 years as Master of the Rolls. (*Lord Denning,* The Times of London (Mar. 6, 1999) p. A-21.)

C. *Alleged Instructional Error*

Defendant alleges various types of instructional error which he claims violates his right to a fair penalty determination under the Eighth and Fourteenth Amendments to the United States Constitution. We find no merit in these claims.

██ Defendant claims various defects in CALJIC No. 8.85, which explains the various aggravating and mitigating factors the jury must weigh, as set forth in section 190.3. First, defendant contends that the trial court should have omitted those mitigating factors for which there was no evidence, because including those factors gave the prosecutor the opportunity to point to the lack of mitigating evidence. At the very least, defendant contends, the trial court should have instructed the jury, according to requested instruction No. 1, that absence of a mitigating factor could not be considered an aggravating factor. But as we have held, "a reasonable juror could not have believed . . . that the absence of mitigation amounted to the presence of aggravation." (*People v. Benson* (1990) 52 Cal.3d 754, 802 [276 Cal.Rptr. 827, 802 P.2d 330].) And, contrary to defendant's contention, nothing in the prosecution's argument noting the absence of various mitigating factors would have misled the jury to consider them as aggravating factors. Nor need the instruction have labeled which factors were mitigating and aggravating. (*Id.* at p. 801.) Nor was the failure to delete inapplicable mitigating factors from the instruction constitutional error. (*People v. Osband* (1996) 13 Cal.4th 622, 704 [55 Cal.Rptr.2d 26, 919 P.2d 640].) ██ Nor is section 190.3, factor (a), asking the jury to consider "the circumstances of the crime of which the defendant was convicted in the present proceeding," unconstitutionally vague. (*People v. Sanders, supra,* 11 Cal.4th at pp. 563–564.)

██ Defendant contends the jury should have been instructed according to requested instruction No. 2, which would have specified 16 types of penalty phase evidence that could be considered in mitigation under section 190.3, factor (k), permitting the jury to consider "any other circumstance which extenuates the gravity of the crime." For example, the requested instruction would have made clear that the jury could consider "whether the defendant was solicited by others to participate in the crimes" and "whether the defendant occupied a position of leadership or dominance of the other participants in the crimes." As we have made clear, factor (k) is adequate for informing the jury that it may take account of any extenuating circumstance, and there is no need to further instruct the jury on specific mitigating

circumstances. (See *People v. Hines* (1997) 15 Cal.4th 997, 1068 [64 Cal.Rptr.2d 594, 938 P.2d 388] [rejecting the need for a "lingering doubt" instruction in addition to factor (k)].) It is generally the task of defense counsel in its closing argument, rather than the trial court in its instructions, to make clear to the jury which penalty phase evidence or circumstances should be considered extenuating under factor (k).

 Defendant claims error in the trial court's failure to instruct according to requested instruction No. 3, that the jury may consider that accomplice Michelle Evans was permitted to plead guilty to a lesser offense although equally culpable. The trial court refused to deliver the instruction and directed defense counsel not to argue that point to the jury. The trial court did not err. "The sentence received by an accomplice is not constitutionally or statutorily relevant as a factor in mitigation. Such information does not bear on the circumstances of the capital crime or on the defendant's own character and record." (*People v. Bemore* (2000) 22 Cal.4th 809, 857 [94 Cal.Rptr.2d 840, 996 P.2d 1152].)

Defendant also claims a defect in CALJIC No. 8.88. The jury was instructed per that instruction that "[i]n weighing the various circumstances you simply determine under the relevant evidence which penalty is justified and appropriate by considering the *totality* of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating evidence is so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." (Italics added.)

 Defendant argues that the instruction's language referring to the "totality" of the aggravating and mitigating circumstances erroneously implied that a single mitigating circumstance could not outweigh all aggravating circumstances and hence could not serve as a basis for the more lenient sentence. We have rejected that argument: "Certainly, [a reasonable] juror would not have interpreted . . . language referring to the 'totality' of the aggravating and mitigating circumstances in a 'death oriented' fashion to 'relate[]' solely to the 'quantity . . . of the factors' and not to their 'quality,' or to entail ' "a *mere mechanical counting* of factors on each side of the imaginary scale . . . ." ' . . . There is no reasonable likelihood that the jury misconstrued or misapplied the challenged instruction in violation of the Eighth or Fourteenth Amendment to the United States Constitution or any other legal provision or principle." (*People v. Berryman* (1993) 6 Cal.4th 1048, 1099–1100 [25 Cal.Rptr.2d 867, 864 P.2d 40], overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

■ Defendant argues that the trial court's failure to instruct the jury at the penalty phase on a reasonable doubt standard, or indeed any standard of proof, for finding that the aggravating evidence is true, or outweighs the mitigating evidence, violated defendant's Fifth, Eighth and Fourteenth Amendment rights. Not so. "The federal Constitution does not require the jury to find beyond a reasonable doubt that the prosecution proved each aggravating factor, that the circumstances in aggravation outweigh those in mitigation, or that death is the appropriate penalty." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118].) " 'Unlike the guilt determination, "the sentencing function is inherently moral and normative, not factual" [citation] and, hence, not susceptible to a burden-of-proof quantification.' " (*People v. Box* (2000) 23 Cal.4th 1153, 1216 [99 Cal.Rptr.2d 69, 5 P.3d 130].)

■ Defendant contends that the jury should have been instructed that the prosecution has the burden of persuasion to convince the jury that death was the appropriate penalty. We have routinely rejected this argument. "[T]he prosecution has no burden of proof that death is the appropriate penalty, or that one or more aggravating factors or crimes exist, in order to obtain a judgment of death." (*People v. Anderson* (2001) 25 Cal.4th 543, 589 [106 Cal.Rptr.2d 575, 22 P.3d 347].) Nor, contrary to defendant's argument, should the jury have been instructed on a presumption of a life without parole sentence. "[N]either death nor life is presumptively appropriate or inappropriate under any set of circumstances, but in all cases the determination of the appropriate penalty remains a question for each individual juror." (*People v. Samayoa* (1997) 15 Cal.4th 795, 853 [64 Cal.Rptr.2d 400, 938 P.2d 2].)

### D. *Trial Court's Refusal to Modify Death Sentence*

The trial court refused defendant's motion to modify the jury verdict of death pursuant to section 190.4, subdivision (e). Defendant contends the trial court erred. We disagree.

Defendant focuses on a statement made by the trial court in the course of explaining its refusal to modify the motion. The court stated: "The function of the court in this motion is to review the evidence, consider and to take into account and be guided by the aggravating and mitigating circumstances, *and then make a determination as to whether the jury's finding and verdicts were or were not contrary to law.*" Defendant contends that the italicized portion of this statement represents a misunderstanding on the trial court's part of its proper function, and that this misunderstanding undermines the validity of its ruling on the motion to modify the verdict.

■ As we have stated: "In ruling on a verdict-modification application, the trial judge is required by section 190.4 [subdivision] (e) to 'make an

independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the applicable law.' [Citations.] That is to say, he must determine whether the jury's decision that death is appropriate under all the circumstances is adequately supported. [Citation.] And he must make that determination independently, i.e., in accordance with the weight he himself believes the evidence deserves. [Citation.]" (*People v. Marshall* (1990) 50 Cal.3d 907, 942 [269 Cal.Rptr. 269, 790 P.2d 676].)

Although the italicized portion of the trial court's statement quoted above may leave some doubt about whether the trial court understood that it was to independently review the jury verdict under section 190.4, subdivision (e), its very next statement removes that doubt. The court stated: "Naturally, the court did reweigh the evidence in making those determinations." A review of the remainder of the court's statement of reasons for denying defendant's motion, in which it explained its independent assessment of each aggravating and mitigating factor and the relative weight given to each, makes clear the trial court understood its proper role and acted accordingly.

Defendant also contends trial court error can be found in the court's statement that a "strong argument could be made" that the death sentence would not have been justified if Raper had been the sole victim, in light of defendant's lack of a criminal record and violent past, as well as his subservient status in Cruz's cult. Defendant argues that the murder of Raper alone would not have made defendant death eligible, and that the trial court's statement that it might modify the death sentence only under a circumstance that would have made defendant ineligible for the death penalty shows that the court "effectively abrogated" its function under section 190.4, subdivision (e).

Defendant distorts the meaning of the trial court's statements. The trial court used the example of the sole murder of Raper as a means of explaining the weight it gave the mitigating evidence. While the court concluded the mitigating evidence was not inconsiderable, and could have led to a reversal of the death sentence had a less aggravated crime been committed, the mitigating evidence did not in the trial court's judgment outweigh the four planned, gruesome murders in which defendant participated as perpetrator and accomplice. The trial court did not suggest, as defendant implies, that it would automatically affirm the verdict because defendant was guilty of multiple murder. Taken in its proper context, we find no error in the trial court's statements.

### E. *Constitutional Challenges to the Death Penalty Law*

Defendant makes various constitutional challenges to the state's death penalty law, contending that the law prevented him from obtaining a fair penalty determination required by the Eighth and Fourteenth Amendments to the United States Constitution. We conclude these challenges have no validity.

 Defendant contends that the jury should have been required to make explicit findings regarding the factors that it found in aggravation and mitigation. We have rejected that claim. (*People v. Kipp* (1998) 18 Cal.4th 349, 381 [75 Cal.Rptr.2d 716, 956 P.2d 1169].)

 Defendant contends that his death sentence is unconstitutionally arbitrary, discriminatory and disproportionate. Specifically, defendant requests that his sentence be reversed pursuant to intercase proportionality review, due to his lack of prior convictions, his youth, and his contention that he acted out of fear for his own life. Additionally, defendant requests an intracase proportionality review, claiming that some of his codefendants who received less severe sentences were more culpable than he was. It is well settled that neither is required. (*People v. Anderson*, *supra*, 25 Cal.4th at p. 602.) For that reason, we reject also defendant's related claim that comparative appellate review is constitutionally compelled.

 Defendant contends that the California death penalty statute violates due process of law for failing to sufficiently channel or limit the sentencer's discretion to prevent wholly arbitrary and capricious death sentences because the jury is neither told which factors are aggravating and mitigating, nor is given any direction as to how to assign weight to those factors. Defendant is incorrect. "We have rejected the contention that the sentencing factors [in section 190.3] are unconstitutional because they do not specify which factors are aggravating and which are mitigating. [Citations]." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1041 [108 Cal.Rptr.2d 291, 25 P.3d 519].) In addition, as the United States Supreme Court has held, a capital sentencer need not be instructed how to weigh the sentencing factors and may be given " 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.' " (*Tuilaepa v. California* (1994) 512 U.S. 967, 979–980 [129 L.Ed.2d 750, 114 S.Ct. 2630].)[13]

 Defendant contends that the California death penalty statute fails to narrow the class of offenders eligible for the death penalty and thus violates

---

[13] We have also rejected the argument found in defendant's reply brief that *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] requires us to reassess the constitutionality of the death penalty statute. (*People v. Valdez* (2004) 32 Cal.4th 73, 139 [8 Cal.Rptr.3d 271, 82 P.3d 296].)

the Eighth Amendment, and article I, section 17 of the California Constitution. In support of this contention, defendant offers a statistical analysis based on an examination of published appeals of murder convictions for the years 1988 to 1992, claiming the statistics show that the California statute fails to narrow the class of death-eligible defendants, particularly because of the broad sweep of the lying-in-wait special circumstance and the various felony murder special circumstances. We come to the same conclusion as we did in *People v. Frye* (1998) 18 Cal.4th 894, 1029 [77 Cal.Rptr.2d 25, 959 P.2d 183], that California's "special circumstances 'are not overinclusive by their number or terms.' . . . Defendant's statistics do not persuade us to reconsider the validity of these decisions."

Defendant contends that the California death penalty scheme is unconstitutional because it allows individual district attorneys unbridled discretion as to which cases will be prosecuted as death penalty cases. This argument is without merit. As we stated in *People v. Lucas* (1995) 12 Cal.4th 415, 477 [48 Cal.Rptr.2d 525, 907 P.2d 373]: "Prosecutors have broad discretion to decide whom to charge, and for what crime. . . . Absent proof of invidious or vindictive prosecution, as a general matter a defendant who has been duly convicted of a capital crime under a constitutional death penalty statute may not be heard to complain on appeal of the prosecutor's exercise of discretion in charging him with special circumstances and seeking the death penalty." Because defendant has not raised a claim of invidious discrimination or vindictive prosecution, his argument fails.

Defendant contends that section 190.3, factor (d), is constitutionally defective because it directs the jury to consider only "*extreme* mental or emotional disturbance" (italics added) and therefore, contrary to the Eighth Amendment, does not permit the jury to consider all available mitigating evidence. Defendant finds the same defect in factor (g), which directs the jury to consider "whether or not defendant acted under *extreme* duress or under the *substantial* domination of another person." (Italics added.) But as we have held, these qualifying adjectives in factors (d) and (g) do not, when read in conjunction with the catchall provisions of factor (k), preclude the jury from considering less extreme forms of duress, emotional disturbance, or domination. (See *People v. Turner* (1994) 8 Cal.4th 137, 208–209 [32 Cal.Rptr.2d 762, 878 P.2d 521].)

Defendant contends that the methods of execution employed in California violate the Eighth and Fourteenth Amendment and requests that his death sentence be vacated. But the constitutionality of those methods bear " ' "solely on the legality of the execution of the sentence and not on the validity of the sentence itself." ' " (*People v. Samayoa, supra,* 15 Cal.4th at p. 864.)

### F. Violations of International Law

Defendant contends that various errors made at trial and various aspects of the trial violate international law. As we have explained, the international treaties and resolutions to which he points have not "been held effective as domestic law" (*People v. Ghent* (1987) 43 Cal.3d 739, 779 [239 Cal.Rptr. 82, 739 P.2d 1250]); see also *People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754]), and are therefore not a basis for reversing the judgment.

### G. Cumulative Error

Defendant contends the various penalty phase errors are, taken together, prejudicial and require reversal of the death sentence. Because we identified only one harmless error at the penalty phase—the prosecution's biblical references—the claim of cumulative error is without merit.

## VI. Restitution Fine

Defendant contends that the trial court erred in imposing a $5,000 restitution fine at the time of sentence pursuant to former section 1202.4 and former Government Code section 13967, subdivision (a). Defendant points to an amendment to the latter statute, effective September 14, 1992 (see *People v. Saelee* (1995) 35 Cal.App.4th 27, 30 [40 Cal.Rptr.2d 790]), which added language that the imposition of the restitution fine is "subject to the defendant's ability to pay." (Italics omitted.)[14] He contends that he has no ability to pay the $5,000 fine and the fine should be reduced to the statutory minimum.

Defendant is not entitled to benefit from the 1992 amendment; it was repealed in 1994. (Stats. 1994, ch. 1106, § 3, pp. 6547.) However, a defendant generally is entitled to benefit from amendments that become effective while his case is on appeal. Here, the question of restitution should be considered under the current version of Penal Code section 1202.4, which provides detailed guidance to the trial court in setting a restitution fine, including consideration of a defendant's ability to pay. "The key date is the date of final judgment. If the amendatory statute lessening punishment becomes effective prior to the date the judgment of conviction becomes final then, in our opinion, it, and not the old statute in effect when the prohibited act was committed, applies." (*In re Estrada* (1965) 63 Cal.2d 740, 744 [48

---

[14] Former Government Code section 13967, subdivision (a) provided in pertinent part at the time defendant was sentenced that "if the person is convicted of one or more felony offenses, the court shall impose a separate and additional restitution fine of not less than one hundred dollars ($100) and not more than ten thousand dollars ($10,000)." (Stats. 1991, ch. 657, § 1, p. 3020.) The 1992 amendment stated in pertinent part: "[I]f the person is convicted of one or more felony offenses, the court shall impose a separate and additional restitution fine of not less than two hundred dollars ($200), *subject to the defendant's ability to pay*, and not more than ten thousand dollars ($10,000)." (Stats. 1992, ch. 682, § 4, p. 2922, italics added.)

Cal.Rptr. 172, 408 P.2d 948].) "In *Pedro T.* we cited with approval a case holding that, for the purpose of determining retroactive application of an amendment to a criminal statute, a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed. (*In re Pedro T.* (1994) 8 Cal.4th 1041, 1046 [36 Cal.Rptr.2d 74, 884 P.2d 1022], citing *In re Pine* (1977) 66 Cal.App.3d 593, 594 [136 Cal.Rptr. 718]; see also *Bell v. Maryland* (1964) 378 U.S. 226, 230 [12 L.Ed.2d 822, 84 S.Ct. 1814] ['The rule applies to any such [criminal] proceeding which, at the time of the supervening legislation, has not yet reached final disposition in the highest court authorized to review it'].)" (*People v. Nasalga* (1996) 12 Cal.4th 784, 789, fn. 5 [50 Cal.Rptr.2d 88, 910 P.2d 1380].)

## VII. DISPOSITION

We reverse the death sentence as to the conspiracy to commit murder count and remand to the trial court to issue an amended abstract of judgment reflecting a sentence of imprisonment for 25 years to life for that count. We also remand to the trial court for reconsideration of the question of a restitution fine under the currently applicable statute. If the People choose not to contest the matter on remand, defendant's restitution fine shall be reduced to the statutory minimum. The judgment of death as to the three other counts, and the judgment in all other respects, is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—I join the majority in upholding defendant's conviction for murder (Pen. Code, § 187) with the special circumstance of multiple murder (Pen. Code, § 190.2, subd. (a)(3)). I write separately, however, to point out a problem with the analysis of one guilt phase issue: the trial court's exclusion of the testimony of cult expert Randy Cerny.

Because I disagree with the majority's conclusion that the prosecutor's biblical argument calling for death did not prejudice defendant, I would reverse the judgment of death.

## I

At the time of the murder, defendant was 21 years old and a submissive member of an occult, satanic cult headed by codefendant Gerald Cruz. Defendant was subjected to a process of mind control that included regular sleep deprivation, severe physical punishment, sexual humiliation, and minimization of contact with his family. Defendant acted as the cult's "slave," doing household chores, cooking, bathing Cruz's children, acting as a handyman, and staying up at night to guard the cultists' camp. He sought Cruz's permission for even the most trivial of matters. Defendant's diary showed

that he had internalized many of Cruz's values: Defendant wrote of the desire to sacrifice himself so that Cruz's health would improve and he expressed gratitude for Cruz being "merciful" when Cruz refrained from having him beaten.

Cruz was angry at Franklin Raper, whom Cruz accused of bringing in illegal drugs and attracting drug users to the vicinity of the cultists' camp. One day, Cruz decided to kill everyone at Raper's residence. Cruz gave the cultists, including defendant, exact orders on what to do and threatened to kill anyone who "messed up." When victim Emmie Paris encountered defendant in Raper's kitchen, she began to scream. Cruz ordered defendant to shut her up, and he handed defendant a knife. Defendant killed Paris with the knife. Defendant was convicted of the murder of Paris. Other cult members killed three other people at the house; defendant was convicted as an accomplice to those killings.

## II

At the guilt phase of defendant's capital trial, the trial court refused to let retired Deputy Sheriff Randy Cerny testify "as an expert in the study of cults, in the mind control of members of cults, how cults operate and what effect it has on the members." (Cerny later testified at the penalty phase.)

After a hearing to determine Cerny's qualifications as an expert, the trial court acknowledged that Cerny was a qualified expert on cults, and that the subject of cult behavior was one beyond common knowledge and could suitably be addressed by an expert opinion. The court, however, barred Cerny from testifying before the jury at the guilt phase, explaining: "Penal Code Section 28 requires that such evidence regard a . . . mental disease, mental defect or mental disorder of the defendant. The Court is not satisfied that Mr. Cerny has the expertise to testify that mind control, if any, brought about by being a member of a cult is a mental disease, mental defect, or mental disorder as to Mr. Vieira or as to any other person." Defense counsel then said, "I never intended to ask him if anyone had a mental disease, disorder, or defect." The trial court replied: "I understand. But to get to [CALJIC No.] 3.32 [the jury instruction incorporating Penal Code section 28], the testimony has to relate to a mental defect, mental disorder, or mental disease or it's irrelevant."

The trial court could well have concluded that defendant, notwithstanding his disclaimer, was offering Cerny's testimony as evidence of mental disease, defect, or disorder, and that such testimony was inadmissible, either because Cerny was not qualified to render an opinion on these mental states or because it was testimony of diminished capacity barred by Penal Code section 28. The problem is that the trial court did not decide whether defendant was offering evidence of mental disease, defect, or disorder.

Instead the court *assumed* that, to be admissible, evidence relating to the mental elements of a crime *must* be evidence of mental disease, defect, or disorder.

That assumption was incorrect. Penal Code section 28 limits only the use of evidence offered to show mental disease, mental defect, or mental disorder; such evidence may not be introduced to show that a defendant lacked the *capacity to form* any mental state essential to a charged crime, but it is admissible on the issue of whether or not the accused *actually formed* the required mental state.[1] There is no rule that evidence offered to show the absence of a mental state essential to first degree murder must be evidence of a mental disease, a mental defect, or a mental disorder. To the contrary, a defendant who does not have a mental disease, mental defect, or mental disorder may still lack the mental state required to commit a specific intent crime, and is entitled to present evidence from which the jury could infer the absence of the requisite mental state. Even if cult expert Cerny was not qualified to testify as to mental disease, defect, or disorder, he might still be qualified to testify about cult behavior, testimony from which the jury could draw inferences about defendant's mental state at the time of the murders.

But even if the trial court erred in barring cult expert Cerny from testifying for the defense at the guilt phase, that error was harmless. Although the jury could have relied on Cerny's testimony to infer absence of premeditation, in light of the evidence that defendant was a willing participant in the killings—he agreed to the plan to kill anyone found at the Raper residence, he laughed when he described the murder of Emmie Paris, and he told his girlfriend that the victims deserved to die—it is not reasonably probable that the jury would have done so. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Moreover, the jury eventually heard defendant's expert evidence when Cerny testified at the penalty phase of the trial and explained how cults use isolation, sleep deprivation, punishment, and occult ritual to dominate and control the minds of their members. The jury nevertheless returned a death verdict.

## III

At the penalty phase of defendant's capital trial, the prosecutor argued to the jury that certain biblical passages justified imposition of the death

---

[1] Section 28, subdivision (a), reads: "Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."

penalty: "People from time to time have a problem because they say, 'Gee, in the Bible it says, "Thou shall not kill," and "Vengeance is mine sayeth the Lord. I will repay." ' That's found in Romans. But in the very next passage . . . , it goes on and calls for capital punishment and says, '[t]he ruler bears not the sword in vain for he is the minister of God, a revenger or to execute wrath upon him that doeth evil.' He's talking about the ruler, the government, whatever.

"Now, the Judeo-Christian ethic comes from the Old Testament—I believe the first five books—called the Torah in the Jewish religion. And there are two very important concepts that are found there. And that's, one, capital punishment for murder is necessary in order to preserve the sanctity of human life, and, two, only the severest penalty of death can underscore the severity of taking life.

"The really interesting passage is in Exodus, chapter 21, verses 12 to 14: 'Whoever strikes another man and kills him shall be put to death. But if he did not act with intent but they met by act of God, the slayer may flee to a place which I will appoint for you.' Kind of like life without possibility of parole, haven, sanctuary. 'But if a man has the presumption to kill another by treachery, you shall take him even from my altar to be put to death.' There is no sanctuary for the intentional killer, according to the Bible.

"Now, I'll leave it at that. That was just in the event any of you have any reservations about religion in this case."

In *People v. Slaughter* (2002) 27 Cal.4th 1187, 1208–1209 [120 Cal.Rptr.2d 477, 47 P.3d 262] (*Slaughter*), the same prosecutor as involved here presented the same biblical argument for the death penalty. This court unanimously held that in making this argument, the prosecutor committed misconduct. But, according to the majority in *Slaughter*, there was no prejudice to the defendant. It reasoned: "Biblical references that rival in length those in the present case were found harmless in *People v. Wash* [(1993)] 6 Cal.4th 215, 261 [24 Cal.Rptr.2d 421, 861 P.2d 1107], because after making the biblical references, 'the prosecutor embarked upon a lengthy and detailed argument devoted exclusively to the evidence in aggravation . . . . He did not return to the subject of God or religion, but instead urged a sentence of death based upon defendant's moral culpability for the crimes in light of the statutory factors.' " (*Slaughter, supra,* 27 Cal.4th at p. 1211.)

I dissented in *Slaughter*, joined by Justice Moreno. The dissent stated: "The majority's assertion that the prosecutor's improper argument must be considered harmless because it was 'part of a longer argument that properly focused upon the factors in aggravation and mitigation' [citation] makes little sense. Under that logic, prosecutors may freely refer to biblical authority when making their penalty arguments to juries in capital cases, secure in the

knowledge that this court will never reverse a resulting death judgment for this misconduct, provided only that the prosecutors also present an argument focusing on the statutory aggravating and mitigating factors. Appeals to divine authority in jury arguments in capital cases are prejudicial when jurors for whom the aggravating and mitigating factors appear closely balanced use religious considerations to resolve their doubts, as the prosecutor's improper argument invites them to do." (*Slaughter, supra,* 27 Cal.4th 1187, 1228 (conc. & dis. opn. of Kennard, J.).)

Like the majority in *Slaughter, supra,* 27 Cal.4th 1187, the majority here considers the prosecutor's improper biblical argument harmless because it was only a part of the prosecutor's total peroration, which focused primarily on the aggravating and mitigating factors. (Maj. opn., *ante,* at pp. 296–297.) Even if I were to agree that the improper argument in *Slaughter, supra,* 27 Cal.4th 1187, was harmless—which I do not—the harmless nature of the *Slaughter* argument would not demonstrate that the improper biblical argument here was harmless.

This is not as aggravated a murder as those in *Slaughter, supra,* 27 Cal.4th 1187. In *Slaughter,* the defendant, acting on his own initiative and for the purpose of robbery, personally shot three people, killing two of them. Defendant here personally killed one person. In doing so, he did not act on his own initiative or for his own personal benefit, but as an obedient slave to cult leader Gerald Cruz.

Moreover, here there is a statutory factor mitigating the crime that was not present in *Slaughter, supra,* 27 Cal.4th 1187. Acting "under extreme duress or under the substantial domination of another person" is a mitigating factor which the jury must take into account if relevant. (Pen. Code, § 190.3, factor (g).) In this case, the evidence shows that defendant acted under the substantial domination of cult leader Gerald Cruz, who controlled every aspect of defendant's life and threatened to kill anyone who did not follow his orders. Absent the pernicious influence of a satanic cult leader, it is doubtful that defendant would have committed murder.

The test of prejudice is whether it is reasonably possible (see *People v. Michaels* (2003) 28 Cal.4th 486, 538 [122 Cal.Rptr.2d 285, 49 P.3d 1032]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1232 [56 Cal.Rptr.2d 49, 920 P.2d 1254]) that, without the prosecutor's improper biblical argument, the jury would not have returned a verdict of death. The circumstances here meet that test. Thus, I would reverse the penalty of death.

Appellants' petition for a rehearing was denied May 26, 2005, and the opinion was modified to read as printed above. Kennard, J., was of the opinion that the petition should be granted.