Filed 11/29/21  P. v. Baca CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>PATRICK LEE BACA,<br><br>     Defendant and Appellant. | F078635<br><br>(Super. Ct. No. PCF321703A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Antonio A. Reyes, Judge.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## **INTRODUCTION**

Appellant Patrick Lee Baca was convicted by jury of second degree murder. (Pen. Code,[1] § 187, subd. (a).) In a bifurcated proceeding, the trial court found Baca had suffered three prior convictions qualifying as strikes (§§ 667, subds. (b)-(i) & 1170.12, subds. (a)-(d)), two prior prison terms (§ 667.5, subd. (b)), and two prior serious felony convictions (§ 667, subd. (a)(1)). The trial court sentenced him to a total prison term of 45 years to life.

On appeal, Baca contends: (1) this court must vacate his murder conviction following the enactment of Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill No. 1437); (2) the trial court erred by failing to instruct the jury sua sponte on direct aiding and abetting (CALCRIM No. 401); (3) the trial court erred by admitting evidence of Baca's prior conviction for assault with a deadly weapon; (4) there is insufficient evidence to support two of the three prior strike allegations found true by the trial court; and (5) he is entitled to a hearing on his ability to pay court-imposed fees and assessments pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

During the pendency of this appeal, Governor Newsom signed Senate Bill No. 1437 and Senate Bill No. 775 (2021-2022 Reg. Sess.) (Senate Bill No. 775) into law. Senate Bill No. 1437 eliminated aiding and abetting murder liability under the felony murder rule and the natural and probable consequences doctrine. Our Supreme Court has held that "[t]he ameliorative provisions of Senate Bill 1437 do not apply on direct appeal to nonfinal convictions obtained before the law became effective. Such convictions may be challenged on Senate Bill 1437 grounds only through a petition filed in the sentencing court under section 1170.95." (*People v. Gentile* (2020) 10 Cal.5th 830, 851-852.)

Following *People v. Gentile*, Governor Newsom signed Senate Bill No. 775 into law. Among other changes, Senate Bill No. 775 added subdivision (g) to section

---

[1] All further undefined citations are to the Penal Code unless otherwise indicated.

1170.95, authorizing "[a] person convicted of murder, attempted murder, or manslaughter whose conviction is not final [to] challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437 (Chapter 1015 of the Statutes of 2018)." This new law will become effective on January 1, 2022 (Cal. Const., art. IV, § 8, subd. (c)), before Baca's appeal will become final.

In a supplemental brief, the People concede Senate Bill No. 775 applies retroactively to Baca's case, and that upon the record, Baca is entitled to reversal of his conviction. We agree as well. We therefore reverse Baca's conviction for second degree murder. As Baca's remaining claims are moot in light of our conclusion, we do not address them.

## FACTS

### *The Prosecution's Case*

On the evening of July 26, 2015, Raquel O. and her boyfriend, Frank, went to dinner at Melanie and Art C.'s house in Porterville for a barbeque. Earl W., Frank's friend, also attended the barbeque.

At approximately 7:00 p.m., Frank's cousin Baca arrived, along with Baca's nephew D.H., and D.H.'s girlfriend. Baca and D.H. were already drinking when they arrived, and they made multiple beer runs throughout the evening with Earl and Frank.

Melanie, the homeowner, became concerned that D.H. and his girlfriend, both minors, were drinking alcohol. Melanie asked Frank if he could do something about it, so Frank spoke to Baca. Baca became upset.

Baca asked Frank, " 'What, Primo? You got a problem.' " Frank replied, " 'As a matter of fact, I do.' " Baca stated, " 'Yeah. Well, let's go handle [this,]' " and pointed toward the backyard. As Frank and Baca headed toward the backyard, the mood of the party shifted.

3.

Frank's girlfriend Raquel became afraid and called Frank's mom. D.H. hit his hands together and stated, " 'We came here to handle some business,' " and ran to the backyard after Frank and Baca.

Frank had a flashlight in his hands with a broken stun gun piece on the end of it. Earl, who was in the backyard when the fight occurred, told police he saw everyone produce a knife during the fight.[2] Earl observed Baca pat Frank on the chest. Frank asked Baca, " 'Is that where you're going to stick me at?' " Baca replied, " 'No.… Not me; it's going to be him.' " D.H. added, " 'Yes, it is.' "

Melanie went into the backyard to breakup the fight. She saw both D.H. and Baca holding knives. Frank held up his flashlight in a defensive mode, trying to defend himself against Baca and D.H. Frank told Baca and D.H. " 'You guys need to leave.' "

D.H. came toward Frank with his knife. Melanie and Frank pushed each other out of the way, causing Melanie to fall into a nearby palm tree, and Frank to fall to the ground. Baca began hitting and kicking Frank, and D.H. was cussing and trying to fight Frank. At some point, Frank tripped and fell to the ground a second time. Baca and D.H. hit and kicked Frank as he was laying on the ground. D.H. stood over Frank, stabbed him, and said, " 'Now it's over, Mother F****r.' "

Lying on the ground, Frank was covered in blood and appeared unable to move. D.H. had stabbed Frank in the heart, fatally wounding him. Earl tried to pick Frank up, but Frank was unconscious. Raquel called 911.

Baca's t-shirt was covered in blood. He removed it and ran towards his vehicle, pushing Raquel out of his way. D.H. followed behind Baca, and the pair drove away, leaving D.H.'s girlfriend behind. Earl claimed that as Baca removed his shirt, Baca stated, " 'Mother f****rs' " and " 'That's what you get.' " At one point after Frank had been stabbed, Earl claimed Baca said, " 'That's how you get in.' "

---

[2] At trial, Earl testified that he did not see Baca holding a knife.

4.

Several days later, Baca was arrested in Exeter. He had washed the shoes and socks he had worn during the fight, and then disposed of the socks and his cellular phone. D.H. was arrested in Bakersfield.

***The Defense's Case***

***D.H.***

D.H. testified at Baca's trial. He stated that when he observed Baca and Frank in the backyard, he thought a fight was imminent and that he should have his uncle's back. D.H. admitted that he had stabbed Frank once during the fight. After the fight, D.H. and Baca fled to D.H.'s sister's home. On the way, D.H. threw the knife into some bushes.

When they arrived at D.H.'s sister's home, Baca and D.H. washed blood off of their hands. Baca told D.H. to "lay low" and not to say anything.

D.H. changed his clothes and Baca dropped him off at D.H.'s friend's home. D.H. was subsequently arrested at his cousin's house in Bakersfield. He had initially told police he stabbed Frank for his uncle. D.H. also told police that he would stand up for his uncle Baca, and that his uncle knew that. D.H. claimed that he did not plan on stabbing Frank, and that he had done so without thinking.

According to D.H., Frank was trying to go after D.H. during the fight, and Baca was trying to hold Frank back. At one point, Baca stepped in between Frank and D.H. D.H. claimed that Baca was unarmed, and that he was the only one armed with a knife.

***Patrick Baca***

Baca admitted he had prior felony convictions for assault, and for assault with a deadly weapon with great bodily injury.

Baca testified that he had a good relationship with his cousin Frank. However, on the night of the incident, Frank attempted to instigate a fight with Baca for unknown reasons. Baca claimed that he attempted to make peace with his cousin, but at some point while they were in the backyard, Frank pulled out a knife or a flashlight. Melanie managed to take the knife away from Frank, but Frank grabbed Baca and pushed him.

Baca believed Frank was going to attack D.H., so Baca attempted to restrain Frank. Both Baca and Frank fell to the ground.

Baca was attempting to subdue Frank again when he observed Frank suddenly grab his chest. Baca realized that Frank was bleeding, but he had not seen D.H. stab Frank. Baca attempted to help Frank, but Frank still wanted to fight Baca. According to Baca, Frank grabbed him. Baca pushed Frank off, but Frank ripped off Baca's shirt during the struggle. Realizing he was unable to assist Frank, Baca ran to his car and he and D.H. drove away.

Baca claimed he did not know D.H. that well, and he had no idea why D.H. would stab Frank on his behalf. Baca claimed that he did not want to see anyone get hurt. Baca stated he never told D.H. not to talk to the police.

## ANALYSIS

### I. Baca is Entitled to Reversal of His Conviction for Second Degree Murder

Baca contends he is entitled to challenge his conviction for second degree murder under Senate Bill No. 1437 on direct appeal, and that because the prosecutor relied exclusively upon the natural and probable consequences doctrine in arguing Baca was liable for murder, he is entitled to reversal of his conviction. The People concede. For the reasons discussed below, we agree with the parties that Baca's conviction for second degree murder must be reversed. We further conclude that the People may retry Baca, if they elect to do so.

### A. The Trial Court's Instructions

At the time of Baca's trial, an aider and abettor could be convicted of second degree murder committed by a direct perpetrator under two theories: (1) as a direct aider and abettor, or (2) under the natural and probable consequences doctrine.

Here, the jury was instructed on only one theory of liability: the natural and probable consequences doctrine. Although the prosecutor discussed aiding and abetting

6.

generally, the jury was not given instructions which would have permitted it to conclude that Baca was guilty of direct aiding and abetting an express or implied malice murder.

The trial court has a sua sponte duty to instruct on aiding and abetting when the prosecution relies on it as a theory of culpability. (*People v. Beeman* (1984) 35 Cal.3d 547, 560-561.) Because the jury was not instructed on CALCRIM No. 401, which sets forth the elements of direct aiding and abetting, we presume the prosecutor did not rely on direct aiding and abetting as a theory of culpability.[3]

## B.    Senate Bill Nos. 1437 & 775

Following Baca's conviction, and while the instant appeal was pending, the Legislature enacted Senate Bill No. 1437, eliminating the felony murder rule and the natural and probable consequences doctrine as these theories pertain to accomplice liability. Our Supreme Court subsequently held in *People v. Gentile, supra,* 10 Cal.5th 830, that "[t]he ameliorative provisions of Senate Bill [No.] 1437 do not apply on direct appeal to nonfinal convictions obtained before the law became effective. Such convictions may be challenged on Senate Bill [No.] 1437 grounds only through a petition filed in the sentencing court under section 1170.95." (*Id.* at pp. 851-852.)

Then, on October 5, 2021, Governor Newsom signed Senate Bill No. 775 into law. Among other changes, Senate Bill No. 775 amended section 1170.95 by adding subdivision (g) to the statute. This subdivision provides the following: "[a] person

_____

[3]    We acknowledge CALCRIM No. 401 addresses the elements of aiding and abetting intended crimes, i.e., murder, and may therefore, as written, not be suitable where a defendant aids and abets an implied malice murder. "[T]he aider and abettor of implied malice murder need not intend the commission of *the crime* of murder. Rather, relative to the aider and abettor's intent, he or she need only intend the commission of the perpetrator's act, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life." (*People v. Powell* (2021) 63 Cal.App.5th 689, 714.) However, as neither CALCRIM No. 401, nor a modified version of this instruction were given to the jury, we presume the prosecutor did not rely on either of these theories—aiding and abetting an express or implied malice murder—in proving Baca's liability for second degree murder.

convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437 (Chapter 1015 of the Statutes of 2018)." By expressly authorizing a defendant whose judgment of conviction is nonfinal to seek relief under Senate Bill No. 1437 on direct appeal, Senate Bill No. 775 has abrogated *People v. Gentile*.

Baca's conviction is currently pending with this court and will not reach finality by January 1, 2022, the date Senate Bill No. 775 will go into effect. (Cal. Const., art. IV, § 8, subd. (c)(1)) [a statute enacted at a regular session of the Legislature generally becomes effective on January 1 of the year following its enactment]; *People v. Vieira* (2005) 35 Cal.4th 264, 306 [a "judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed"]); *People v. Lizarraga* (2020) 56 Cal.App.5th 201, 206 ["a petition for writ of certiorari is timely filed within 90 days after entry of judgment of a state court of last resort"].) If a statutory amendment mitigating punishment "becomes effective prior to the date the judgment of conviction becomes final then[] … it, and not the old statute in effect when the prohibited act was committed, applies." (*In re Estrada* (1965) 63 Cal.2d 740, 744.) Baca is therefore entitled to challenge his conviction for second degree murder on direct appeal.

## C.  Prejudice

In a supplemental brief, the People concede Baca is entitled to reversal of his conviction.[4] We agree. The jury was permitted to consider the question of Baca's

---

[4]  Subdivision (e) of section 1170.95 provides, "[I]f petitioner is entitled to relief pursuant to this section, murder was charged generically, and the target offense was not charged, the petitioner's conviction shall be redesignated as the target offense or underlying felony for resentencing purposes. Any applicable statute of limitations shall not be a bar to the court's redesignation of the offense for this purpose." (§ 1170.95, subd. (e).) Baca persuasively argues this remedy is limited to persons who successfully seek relief utilizing the petition procedures under section 1170.95, subdivisions (a) through (e). In light of the fact that this remedy was originally proscribed in the context of section 1170.95's petition procedures, we agree that it appears to be exclusive to those

liability for murder based solely upon the natural and probable consequences doctrine, a now invalid theory.

When a jury is presented with two theories upon which to convict, and one of those theories is or becomes legally invalid, reversal is not required if the error is harmless beyond a reasonable doubt. (*People v. Aledamat* (2019) 8 Cal.5th 1, 3, 9, citing *Chapman v. California* (1967) 386 U.S. 18, 24.) Here, there was only one theory of liability presented to the jury. Thus, we cannot conclude that the error was harmless beyond a reasonable doubt.

The People assert they are permitted to retry Baca for second degree murder. Baca concedes there is evidence upon the record to support his liability for murder as a direct aider and abettor. He contends the jury could infer from statements he made before and after the stabbing that he intended for D.H. to kill Frank. Although we agree, we emphasize that Baca need not have shared D.H.'s murderous intent to be convicted as a direct aider and abettor. As our Supreme Court has explained, "an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*People v. Gentile*, *supra*, 10 Cal.5th at p. 850.) To this end, based upon the evidence adduced at trial, the jury could have concluded Baca directly aided and abetted an implied malice murder, if that theory had been presented to the jury.

As a general rule, it is well established that if the defendant secures on appeal a reversal of his conviction based on trial errors other than insufficiency of evidence, he is subject to retrial. (People v. Hernandez (2003) 30 Cal.4th 1, 6.) Because there is substantial evidence to support Baca's conviction for second degree murder

who seek relief under Senate Bill No. 1437 by filing a petition in the sentencing court below.

9.

notwithstanding the instructional error discussed above, the People are entitled to retry Baca, should they choose to do so.

## **<u>DISPOSITION</u>**

The judgment of conviction is reversed. If the People elect to retry Baca for second degree murder, they must bring him to trial within 60 days after the filing of the remittitur in the trial court pursuant to Penal Code section 1382, subdivision (a)(2).


                                                 SMITH, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


SNAUFFER, J.

10.