Filed 3/25/22  P. v. Moore CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C091062 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-FE-2017-0008934) |
| v. | |
| AARON ROBERT MOORE, | |
| Defendant and Appellant. | |

A jury found defendant Aaron Robert Moore guilty of four counts of attempted premeditated murder, three counts of shooting at an inhabited dwelling or occupied vehicle, and assault with a firearm related to two driveby shootings he committed a week apart.  As to each of those counts of conviction, the jury found true that defendant committed those offenses for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote, further, or assist in any

1

criminal conduct by gang members.  (Pen. Code, § 186.22, subd. (b)(1), (4) & (5).)[1]  The jury also found true multiple firearm enhancements.  Relating to a separate incident, the jury found defendant guilty of carrying a concealed and unregistered firearm in a vehicle.

On appeal, defendant contends the evidence is insufficient to support the jury's finding regarding the gang enhancements.  He also raises claims related to his sentencing, which, as we explain *post*, we need not and do not reach.

Following completion of briefing, defendant requested leave to file supplemental briefing regarding the effect of newly enacted Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill No. 333) on this case.  Assembly Bill No. 333 amended section 186.22 to require proof of additional elements to establish a gang enhancement.  (Stats. 2021, ch. 699, § 3, eff. Jan. 1, 2022.)  We granted defendant's request and received briefing from both parties.  Defendant argues that changes to section 186.22 made by Assembly Bill No. 333 require that we vacate the gang enhancement and certain firearm enhancement findings and remand the matter for a limited retrial.  The Attorney General agrees, and we agree with the parties.  Accordingly, we vacate the gang enhancement and certain firearm enhancement findings, as discussed *post*, and remand for further proceedings.  Because we remand for possible retrial and full resentencing, we need not and do not address the remainder of defendant's claims.

## FACTS AND PROCEEDINGS

*Sleeperz Dream Background*

Law enforcement began monitoring Sleeperz Dream in January 2017 and documented it as a criminal street gang in May 2017.  Sleeperz Dream did not have a specific territory, but its members could be found in the north Stockton area and some areas of the Weston Ranch community.  In the spring and summer of 2017, the gang had

---

[1]  Further undesignated statutory references are to the Penal Code.

approximately 10 members, many of whom had gone to high school together. Detective Julio Morales, who testified as an expert on Stockton gangs and whose testimony we will recount in greater detail *post*, identified defendant as a Sleeperz Dream gang member.

*June 17, 2017 Shooting*[2]

On June 17, Daniel B., Jessica B., Josh D., and Michael A. attended a family party in South Stockton. Other guests included Daniel's sister, Alyssa B., Julia Calderon, and Calderon's friend, Ariana Foster.

At the time of the party, Foster was seeing and talking to defendant every day; she did not remember whether she was dating him at the time, but at some point she was. Calderon was dating Freddie Collins, a Sleeperz Dream member. Defendant and Collins were cousins. Daniel, Alyssa, Jessica, Calderon, Foster, Collins, and defendant had all attended the same high school. Collins did not like Daniel because Calderon was previously romantically interested in Daniel, and Alyssa did not get along with Foster because defendant had previously dated Alyssa.

As Daniel, Jessica, Josh, and Michael were leaving the party, Michael yelled something at Calderon.[3] Foster testified that a White or Mexican male said to Calderon: "You stupid fat bitch. What are you doing out south?" According to Foster, Calderon did not respond. As the group drove away, Foster testified that the male told Calderon, "You're about to get caught lacking for being on the south side." Foster did not understand what that meant, but she believed it had been a threat to Calderon. Foster thought Calderon had dated the male, and there had been a "conflict" between him and Calderon. Jessica heard Calderon yell something along the lines of, "[w]e'll see. We'll

---

[2] All future date references are to 2017, unless otherwise stated.

[3] Michael testified that he knew who Calderon was, but he did not remember if he saw her at the party or if anything happened between them.

3

see." After that incident, Foster and Calderon stayed at the party for approximately 30 to 45 minutes.

When Daniel, Jessica, Josh, and Michael arrived back at their house, Josh parked his SUV in the driveway. The garage door opener was not functioning, so Daniel and Michael got out of the SUV and walked toward the front door of the house. Josh and Jessica waited in the SUV.

A car drove down the street, and someone inside the car fired gunshots at the house and SUV. Daniel and Michael hid behind a pillar near the front door until the gunshots stopped. Josh and Jessica ducked down inside the SUV. Bullets hit the SUV, house, and garage door. Daniel did not hear anyone in the car say anything before, during, or after the shooting. Josh heard someone inside the car scream after the car drove past the house, but he did not recall what the person said. No one was wounded.

At 10:40 p.m., a 911 caller reported the gunshots. Cell tower site evidence was consistent with defendant's and Collins' cell phones traveling from Calderon's house to the area of the shooting minutes before the 911 call and then traveling back to Calderon's house. Collins was later convicted of attempted murder and admitted a gang enhancement. Police officers located seven shell casings from a .40-caliber handgun-- that a firearms expert testified matched a gun later seized from defendant--and two shell casings from a nine-millimeter handgun.

Cell phone records demonstrated that multiple calls took place between Calderon, Collins, defendant, and Foster between 10:17 and 10:50 p.m. Notably, a call from Calderon to Collins at 10:17 p.m. lasted for 35 seconds, and a call from Collins to defendant one minute later lasted for 17 seconds. Collins called Calderon at 10:20 p.m., Calderon called Collins at 10:21 p.m., and Collins called Calderon at 10:35 and 10:38 p.m. At 10:34 p.m., Calderon texted Alyssa, "You with your brother [Daniel] and them?" Alyssa responded that she was not, and asked her why she wanted to know; Calderon did not respond. Defendant called Foster at 10:19 p.m. and 10:39 p.m. Defendant also called

4

Sleeperz Dream member Michael Serrano at 10:38 p.m., but the call went to voicemail. At 10:40 p.m., when the shots were reported, Serrano called defendant and Collins called Calderon. Defendant then called Sleeperz Dream member Marlin Logan.

The day after the shooting, defendant posted on his Twitter account, "Ima shooter. If I'm shot, Ik [I know] I had it comin."

*June 25 Shooting*

On June 24, one week after the previous shooting, defendant posted a series of tweets referring generally to a robbery, stating that he "[m]ade it on the starting lineup because I was shooting," discussing driveby shootings, and stating, "[w]e shutting shit down if they don't let us in the party."

Later that night, approximately 100 people attended a party at a house in the Weston Ranch area of Stockton. The party lasted into the early morning hours of June 25. Sierra Riggleman attended the party with a friend--who had previously been in a romantic relationship with defendant--and Sleeperz Dream member Johnny Rodriguez. Riggleman knew multiple Sleeperz Dream members, was in "some kind of romantic relationship" with Sleeperz Dream member Michael Serrano, and was close friends with defendant. Riggleman had appeared in photographs with Sleeperz Dream members wearing a Sleeperz Dream sweatshirt and holding a gun or, in some instances, guns she described as "props." Riggleman was not invited to the party and she did not know the hosts of the party. Cell tower site evidence was consistent with Riggleman's cell phone being near the party's location at 12:37 a.m. and between 1:45 and 2:15 a.m.

The host of the party later told a police officer that a group of approximately 15 to 20 "Hispanic" teenage males and females, whom he did not know, came to his house at approximately 2:00 a.m. He told them it was a private party and asked them to leave. Riggleman did not remember if anyone from the party had asked her to leave.

5

Approximately 10 minutes later, multiple gunshots were fired from a car driving past the party. The bullets struck the house, garage, and a car parked in front of the house. One attendee was shot in the hip. At 2:06 a.m., a 911 caller reported that shots had been fired. Police officers responding to the scene attempted to talk to people attending the party, including the person who was shot, but no one wanted to make a statement. A neighbor told police she heard 10 to 15 gunshots.

Cell tower site evidence was consistent with defendant and Serrano being near the location of the party between 1:45 and 2:15 a.m. Other cell tower evidence suggested Serrano and defendant had not been at the party prior to the shooting. Officers located 14 shell casings fired from a .40-caliber handgun--that a firearms expert testified matched a gun later seized from defendant--and shell casings from a nine-millimeter handgun.

*Social Media Activity*

In the afternoon of June 25, defendant posted a Snapchat video that included two handguns; one of them was a Glock and the other appeared to be a Glock. The overlay caption on the video said, "[w]hat should I rock today?" Later that day, defendant posted a Snapchat video that included a vehicle and a hand holding a handgun with an extended magazine. The caption on the video said, "[t]his is how I coming."

The next day, defendant retweeted a post by another Sleeperz Dream member that said: "I really love my niggas when I called then they slid right away," and a reply to that tweet stating: "for me brother's anybody can get it!!" To "slide" means to commit a crime, typically a shooting.

On June 29, defendant replied to a tweet that said: "How is you niggas shootin broad day recklessly with kids outside, parents and shit [¶] You niggaz trippin." Defendant replied, "If it's fonk then it's fonk." "Fonk" is a dispute or conflict. The next day, defendant posted a Snapchat video that showed him pointing a handgun at the camera and Logan holding a handgun. The overlay caption on the video said: "Two phone calls and it's over."

6

On June 30, defendant posted a series of five tweets that referred to guns or bullets, suggested taking credit for killing somebody, suggested he was on a "team full of shooters," and referenced trying to shoot opponents. He also tweeted, "We got the cops like stop all of that drilling [shooting], we begging just [please]." Detective Morales testified that a group called Project Cease Fire worked with the police department to try to identify individuals who had been committing violent crimes, particularly gun violence. After the individuals had been identified through Project Cease Fire or other law enforcement tools, the individuals were given a "cease fire admonishment" from a law enforcement officer and told to stop the gun violence. During the spring and summer of 2017, Sleeperz Dream was identified as needing that admonishment and its members were given the message.

On July 2, defendant again tweeted about killing people every time "we pop out." The following day he tweeted: "Don't do street shit if you ain't ready to do life or die." The next day he tweeted: "I'm surrounded by my niggas and some 40's, you surrounded by some snitches and the police."

*Law Enforcement Investigation*

On July 5, defendant was detained in a traffic stop, and a loaded .40-caliber handgun was discovered in the car; he was arrested and charged with gun possession. The gun's serial number matched the serial number of a gun appearing in one of defendant's Snapchat videos, and a firearms expert opined that the .40-caliber shell casings found at the scenes of the June 17 and June 25 shootings were fired from the gun. The expert testified that the nine-millimeter shell casings found at the two shootings had been fired from different guns.

Officers searched defendant's house and discovered an unfired .40-caliber round, an empty plastic bag with a manufacturer's tag identifying the contents as an extended magazine for a .40-caliber Glock, and a backpack with "Sleeperz Dream" written on one of the straps. The extended magazine would have fit the gun seized from defendant.

7

*Defendant's Subsequent Statements*

On August 11, more than a month after his arrest for gun possession, defendant tweeted: "Any type of snitching ain't tolerated." The next day he tweeted, "[m]y name rings bells through the city streets," which meant that he had been so active committing crimes that other people had been talking about him. On August 17, he tweeted, "[g]et out of Stockton, move to L.A. where I ain't gotta keep a tool [handgun]." On August 25, defendant tweeted, "I don't do this shit for fame, bitch. I do this shit for gang!"

*Criminal Street Gang Evidence*

Detective Morales was assigned to the gang violence suppression unit from January 2015 to December 2018; his primary duty was to investigate African-American gangs.[4] Before being assigned to the gang violence suppression unit, Morales worked in the community response team, which patrolled high crime areas and required him to make contact with gang members and to conduct arrests and searches. He attended basic and advanced 40-hour gang investigation courses in addition to gang-related conferences. He had participated in approximately 500 gang-related investigations and 300 gang-related arrests. As part of his duties, Morales spoke to gang members in and out of custody about gang lifestyle, current trends in gang behavior and popular culture, other gang members, the types of crimes they commit, and the types of crimes other gang members commit. He also used social media to investigate gangs because members often post photographs of themselves holding gang signs with other gang members, and to learn which gangs are feuding. He had qualified to testify as a gang expert in 21 previous trials.

---

[4] Defendant is of African-American and Laotian descent.

Morales testified that Sleeperz Dream had engaged in a pattern of criminal gang activity during the previous three years, and the primary activities of the gang were attempted murder, shooting at an inhabited dwelling or occupied vehicle, robbery, burglary, and possession of illegal weapons. Specifically, Morales noted that Sleeperz Dream member Steve Johnson was convicted of carrying a loaded firearm at the time he was arrested on May 19, 2017, and Collins was convicted of attempted second degree murder with a gang enhancement related to the June 17 shooting.

Morales opined that defendant was a Sleeperz Dream gang member. He pointed to an August 2016 traffic stop when officers discovered two firearms in a car driven by Logan in which defendant was a passenger; one of the firearms was a .40-caliber Glock that was discovered on the front passenger side floorboard. Morales also cited the backpack found in defendant's room that had Sleeperz Dreams written on it.

Additionally, Morales relied on pictures, other social media posts, and publicly posted rap videos to identify and document individuals as gang members. He testified that gangs often use social media to bolster their reputation, and he used defendant's posts to explain aspects of gang culture. For example, on June 5, defendant tweeted, "If I tell my nigga get 'em, he gonna get 'em. If I tell my nigga strip 'em, he gonna strip 'em." Morales testified that this tweet meant that his friend would shoot or rob someone if directed. On June 9, defendant tweeted, "nigga don't slide [commit a shooting] or shoot back." On June 11, defendant tweeted, "[h]ow you all shooters but ain't pop shit . . . . Your whole team broke." Morales opined that the tweet was "basically saying how are you guys shooters when you actually" have never shot anyone. On June 13, he tweeted, "[h]ow do you claim you niggas hard, but when we slid, you'll ain't bust [shoot] back." Morales understood these tweets to be making fun of people who do not shoot back after they were victims of violence. On June 17, defendant tweeted: "My niggas fighting cases because all my niggas are active." "Fighting cases" referred to fighting cases in a

9

criminal court. Morales explained that the tweet meant that defendant's associates had been committing crimes for the gang and getting arrested for them.

Morales testified that having a reputation for violence was important in gang culture because violence demonstrates power and that the gang was capable of committing acts of violence without fear of repercussions. Committing a shooting means the individual gang members are willing to use violence whether or not they are disrespected. This instills fear in rivals and the community, making people less likely to report crimes. Additionally, being labeled as a shooter--someone who has committed a violent crime using a firearm--is "kind of a high level status for somebody." A gang member who is challenged may turn to another member who is a shooter for support. In gang culture, a person will be disrespected if he calls himself a shooter but has never shot anyone. If an act of violence was committed against a gang or its members, the gang must retaliate or it and its members will be considered weak. This could include driveby shootings, which Morales knew to be committed by gangs in Stockton. To that end, it was important for a gang to possess and carry firearms to protect the gang members and to commit crimes.

Loyalty is also an important part of gang culture. On May 30, defendant tweeted, "I'll pop my own nigga if he disloyal." Morales testified that the tweet meant defendant would shoot his own friend if he were disloyal to him. Morales explained that the tweet could have been directed at a particular person, but only that person or a small group of people would have understood for whom the tweet had been intended. "Snitching," or talking to the police about a crime that was committed, is prohibited and can be punished by violence against the individual or their family.

Sleeperz Dream had several rap videos publicly posted on YouTube; they glorified acts of violence. In the videos, gang members discussed the use of firearms and the requirement that a gang member must shoot someone before being labeled a "shooter." If someone successfully commits a crime, that is considered a "win" for the group.

10

Members will do what they can to make a name for themselves, and killing someone is the best way to make such a reputation. These videos were a way to tell rivals that the gang included shooters. In one video, defendant appeared with several other Sleeperz Dream members, and some of the people in the video, including defendant, held firearms. The rap videos also discussed expensive clothing and other items and having the financial ability to purchase them. Gangs and their members value money because it demonstrates that the gang is successful. Posting pictures of firearms, nice cars, and stacks of money on social media is a way to demonstrate the gang's success.

In response to a hypothetical question based on the facts of the June 17 shooting, Morales opined that the shooting was committed for the benefit of and in association with the gang. The shooting was committed in association with the gang because the girlfriend of a gang member was disrespected; she then communicated that disrespect to her gang member boyfriend, who responded to the location of the disrespect in the company of other gang members. Failing to respond to the disrespect would have been a sign of weakness. The gang member would seek assistance from fellow gang members with a reputation for being shooters, and the gang members would trust one another to not talk to law enforcement. The gang benefitted from the shooting because its members retaliated and addressed the disrespect, bolstering their reputation for committing violent crimes. Boasting about being a shooter on social media soon after the crime was committed showed that the gang was taking responsibility for the crime, even if the posts did not provide specific details of the crime.

In response to a hypothetical question based on the facts of the June 25 shooting, Morales opined the shooting was in association with and benefited the gang. The shooting was in association with the gang because "the group of people that you're with, they're associated with the gang. You have your fellow members there." The shooting benefitted the gang because members, friends, or associates of the gang were disrespected and potentially embarrassed when they were told to leave the party. It would be a sign of

weakness to not respond to that disrespect, and therefore the gang needed to retaliate. Boasting about the crime on social media bolstered the reputation of the gang, and the people who were responsible for the crime would be labeled as "shooters." Finally, the shooting instilled fear in the community and in rivals, which allowed the gang to commit additional crimes without fear of police intervention.

Morales acknowledged that there was no evidence anyone yelled out a gang name, wore gang colors, or flashed gang signs during the two incidents at issue in this case. Indeed, Morales agreed that the gang had no known colors, tattoos, rivals, or initiation process. No member of the gang acted as a confidential informant, and no former member of the gang had been debriefed. However, Morales observed that it was rare for a gang member to yell out the gang's name when committing a crime. He also agreed that none of defendant's Twitter posts referenced Sleeperz Dream. He did not know the identity of the people asked to leave the June 24 party, or if defendant was among them. There were no statements from the people attending the party that they knew of Sleeperz Dream or defendant. Morales did not know if any of the victims had gang ties.

*Verdict and Sentence*

As to the June 17 shooting, the jury found defendant guilty of four counts of attempted premeditated murder (§§ 664, 187, subd. (a); counts 1-4) and two counts of shooting at an inhabited dwelling or occupied vehicle (§ 246; counts 5-6). As to each of counts 1 through 4, the jury found true the allegations that defendant personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and a principal personally and intentionally discharged a firearm during the commission of the crimes (§ 12022.53, subds. (c), (e)(1)). We refer to these latter four enhancements as the "gang-related firearm enhancements," as does defendant in his briefing, see *post*.

Regarding the June 25 shooting, the jury found defendant guilty of assault with a semiautomatic firearm (§ 245, subd. (b); count 8), and shooting at an inhabited dwelling (§ 246; count 9). As to count 8, the jury found defendant personally used a firearm during the commission of the crime (§ 12022.5, subd. (a)), and as to count 9, that he personally and intentionally discharged a firearm causing great bodily injury during the commission of the crime (§ 12022.53, subd. (d)).

As to counts 1 through 6, 8, and 9, the jury found true the allegation that the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote, further, or assist in any criminal conduct by gang members. (§ 186.22, subd. (b)(1), (4)(B), (5).)

Related to his arrest on July 5, the jury found defendant guilty of carrying an unregistered loaded firearm in a vehicle (§ 25850, subds. (a)(1), (c)(6); count 10), and of carrying a concealed firearm in a vehicle (§ 25400, subds. (a)(1), (c)(6); count 11).[5]

On December 2, 2019, the trial court sentenced defendant to prison for a determinate term of 99 years eight months, plus an indeterminate term of 115 years to life. On each of counts 1 through 4 and the accompanying firearm and gang enhancements, the court sentenced defendant to consecutive sentences of 15 years to life (§ 186.22, subd. (b)(5)), plus 20 years on each count for the section 12022.53, subdivision (c) enhancements, staying imposition of the gang-related firearm enhancements. (§ 12022.53, subds. (c), (e)(1).)

---

[5] The trial court granted the People's motion to dismiss count 7, which charged defendant with attempted premeditated murder regarding the June 25 shooting (§§ 664, 187, subd. (a)), and count 12, which charged defendant with possession of a firearm by a restricted person (§ 29815, subd. (a)).

13

On count 5, the trial court sentenced defendant to 15 years to life in prison. (§ 186.22, subd. (b)(4)(B).) On count 8, the court imposed the upper term of nine years, plus the upper term of 10 years for the firearm enhancement (§ 12022.5, subd. (a)), but it stayed the gang enhancement as to that count (§ 186.22, subd. (b)(1)). As to count 9, the court imposed a sentence of 15 years to life (§ 186.22, subd. (b)(4)(B)), plus 25 years to life on the firearm enhancement (§ 12022.53, subd. (d)). The court sentenced defendant to eight months on count 10, to run consecutive to the sentence on count 8. It imposed a sentence of 15 years to life on count 6 (§ 186.22, subd. (b)(4)(B)), and eight months on count 11, but stayed those sentences pursuant to section 654.

Defendant timely filed a notice of appeal. The case was fully briefed on August 30, 2021. On November 10, 2021, we sent an oral argument waiver notice to the parties, but, two days later, defendant requested leave to file supplemental briefing on the effect of Assembly Bill No. 333 on this case. We granted that request, and the parties completed supplemental briefing on February 3, 2022, and waived oral argument thereafter.

## DISCUSSION

### I

### *Assembly Bill No. 333*

In his supplemental briefing, defendant asserts that Assembly Bill No. 333 should be applied retroactively to his case and that, under the law as amended, there is insufficient evidence to support imposition of not only the gang enhancements under section 186.22, subdivision (b), but also the gang-related firearm enhancements (§ 12022.53, subds. (c), (e)(1)). He asks us to strike the true findings on these enhancements and remand the matter to the trial court for possible retrial.

14

The Attorney General concedes that defendant is entitled to the ameliorative effects of Assembly Bill No. 333's amendments to section 186.22 because his judgment will not be final when the new legislation takes effect, and he agrees that the gang enhancements must be vacated and the matter remanded. As we next explain, we agree with the parties.

A. *Retroactivity*

Generally, "where [an] amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed," so long as the amended statute takes effect before the judgment of conviction is final. (*In re Estrada* (1965) 63 Cal.2d 740, 748; *People v. Floyd* (2003) 31 Cal.4th 179, 184.) *Estrada's* retroactivity rule pertains to statutory amendments that reduce penal sanctions, those that eliminate penal sanctions entirely, and those that redefine the conduct subject to an enhancement to a defendant's benefit. (*People v. McKenzie* (2020) 9 Cal.5th 40, 45; *People v. Lopez* (2021) 73 Cal.App.5th 327, 344.) "This rule rests on an inference that when the Legislature has reduced the punishment for an offense, it has determined the 'former penalty was too severe' [citation] and therefore 'must have intended that the new statute imposing the new lighter penalty . . . should apply to every case to which it constitutionally could apply.' " (*People v. DeHoyos* (2018) 4 Cal.5th 594, 600.)

" '[F]or purposes of *Estrada* retroactivity, the focus is not on when a conviction becomes final but rather when the sentence imposed on that conviction becomes final,' a question of law that we review de novo." (*People v. Andahl* (2021) 62 Cal.App.5th 203, 208, review granted June 16, 2021, S268336.) Because defendant's case is not yet final on appeal, he is eligible to take advantage of the ameliorative benefits of Assembly Bill No. 333. (See *People v. Vieira* (2005) 35 Cal.4th 264, 306 [" '[A] judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed' "].)

15

B. *Statutory Framework*

Section 186.22 provides for enhanced punishment when a person is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b)(1).) Prior to the enactment of Assembly Bill No. 333, a " 'criminal street gang' " was defined as "any *ongoing organization, association, or group* of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, former subd. (f), italics added.) Effective January 1, 2022, Assembly Bill No. 333 narrowed the definition of " 'criminal street gang' " to be "an *ongoing, organized association or group* of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f), as amended by Stats. 2021, ch. 699, § 3, eff. Jan. 1, 2022, italics added.)

Assembly Bill No. 333 also altered the requirements for proving the "pattern of criminal gang activity" necessary to establish the existence of a criminal street gang. Before Assembly Bill No. 333 was enacted, section 186.22, subdivision (e) defined a " 'pattern of criminal gang activity' " as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (§ 186.22, former subd. (e).) Assembly Bill No. 333 redefined

16

" 'pattern of criminal gang activity' " to require that the last of the predicate offenses "occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed," and that the predicate offenses "were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offenses is more than reputational." (§ 186.22, subd. (e)(1), as amended by Stats. 2021, ch. 699, § 3.) Additionally, the currently charged offense can no longer be used as a predicate offense. (§ 186.22, subd. (e)(2), as amended by Stats. 2021, ch. 699, § 3.) With respect to common benefit, section 186.22, subdivision (g) now explains: "[T]o benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g), as amended by Stats. 2021, ch. 699, § 3.)

C. *Analysis*

Defendant contends that the evidence presented at trial is no longer sufficient to sustain the jury's true finding on the gang enhancement allegations. The Attorney General agrees, and we agree with the parties.

To prove the pattern of gang activity necessary to establish the existence of a criminal street gang, the prosecution offered evidence of two predicate crimes: Johnson's 2017 conviction for carrying a loaded firearm in a vehicle (§ 25850, subd. (c)(6)), and Collins' January 2019 conviction for attempted second degree murder (§§ 664, 187, subd. (a)) and true finding on a gang enhancement, related to his involvement in the June 17 shooting charged here. However, following the amendments to section 186.22 made by Assembly Bill No. 333, the evidence presented at trial regarding these predicate offenses is insufficient to prove a pattern of gang activity.

17

Regarding Johnson's crime, there was no evidence that his crime "commonly benefited" the gang in a way that was more than reputational, and the jury was not instructed that it had to make such a finding. Additionally, there was no evidence that he committed the crime with more than one gang member, as now required by section 186.22. Thus, absent additional evidence regarding the circumstances of that crime, Johnson's conviction no longer qualifies as a predicate offense supporting a gang enhancement.

Next, Collins' conviction of attempted murder was related to the charged June 17 shooting, and therefore that conviction can no longer be used to support a gang allegation because the amended statute prohibits using the current offense as a predicate offense. (§ 186.22, subd. (e)(2).) Thus, while there was evidence that Collins committed that crime with another gang member--defendant--and that his crime was committed on behalf of the gang, that crime cannot be used as a predicate offense to establish a pattern of criminal gang activity.

Defendant further contends the evidence presented at trial is insufficient to support a finding that Sleeperz Dream was a criminal street gang under the amended statute, which now defines " 'criminal street gang' " in part as "an *ongoing, organized association or group* of three or more persons, whether formal or informal." (§ 186.22, subd. (f), italics added, as amended by Stats. 2021, ch. 699, § 3.) The statute previously defined the term in part as "any *ongoing organization, association, or group* of three or more persons, whether formal or informal." (§ 186.22, former subd. (f), italics added.) Defendant contends Sleeperz Dream was newly formed, had no known connections to larger gangs, did not have a specific territory, was not identified with specific colors, symbols, signs, graffiti, or tattoos, did not have a known initiation process, and there were no gang affiliations mentioned during the charged shootings.

Defendant does not discuss how Assembly Bill No. 333's amendment to the definition of " 'criminal street gang' " affects the proof required to establish the existence

18

of a criminal street gang.  However, a plain reading of the amended statute demonstrates the Legislature's intent to require that a criminal street gang be "organized" in a way that was not previously required.  The legislative history of Assembly Bill No. 333 supports this conclusion.  A bill analysis by the Assembly Committee on Public Safety stated: "This bill would redefine the term[] . . . 'criminal street gang.'  In doing so, this bill . . . would require proof of organization (an established [hierarchy])."  (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 333 (2021-2022 Reg. Sess.) as amended March 30, 2021, p. 5.)  That same bill analysis quoted the Committee on Revision of the Penal Code's 2020 Annual Report:  " '[I]n comparison to California, other states require more evidence of connection or organization between gang members for gang enhancements to apply.  For example, in Illinois, to qualify as a criminal street gang, it must be shown that a group has 'an established hierarchy.[']  In Arkansas, a person commits the offense of engaging in a criminal gang when they commit two or more predicate offenses 'in concert' with two or more other persons.  In Maryland, a 'criminal organization' is required to have an 'organizational or command structure,' and to convict a person of participating in a criminal organization, the prosecution must prove the defendant had knowledge of the pattern of criminality of members of the gang." (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 333 (2021-2022 Reg. Sess.) as amended March 30, 2021, p. 7, quoting Com. on Revision of the Penal Code, 2020 Annual Report, Feb. 2020, p. 47.)  The analysis further noted the Committee's recommendation to "[f]ocus the definition of 'criminal street gang' to target *organized*, violent enterprises."  (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 333 (2021-2022 Reg. Sess.) as amended March 30, 2021, p. 7, italics added, quoting Com. on Revision of the Penal Code, 2020 Annual Report, Feb. 2020, p. 44.)  Pursuant to that recommendation, according to the analysis, "this bill's definition of 'criminal street gang' would include a requirement that the prosecution prove that the organization, association or group of three or more persons has an 'established hierarchy.' "  (Assem. Com. on

19

Public Safety, Analysis of Assem. Bill No. 333 (2021-2022 Reg. Sess.) as amended March 30, 2021, p. 8.)

Here, there was no evidence presented regarding the hierarchy of Sleeperz Dream that would satisfy the definition of " 'criminal street gang' " under Assembly Bill No. 333. Accordingly, because we conclude that the evidence was insufficient to show a pattern of gang activity or the existence of an organized association or group, the gang enhancement findings must be vacated and the matter remanded to give the prosecution the opportunity to prove the applicability of the enhancements under the amendments to section 186.22. (See *People v. Lopez*, *supra*, 73 Cal.App.5th at p. 346.)

D. *Firearm Enhancements*

Defendant further contends that we must vacate the true findings regarding the "gang-related firearm enhancements." Although he does not identify the specific findings he seeks to vacate, because section 12022.53, subdivision (e)(1) requires a violation of section 186.22, subdivision (b), we assume the allegations accompanying counts 1 through 4 that a principal personally and intentionally discharged a firearm during the commission of the crimes (§ 12022.53, subds. (c), (e)(1)) are the gang-related firearm enhancements he challenges here. The Attorney General does not specifically address firearm enhancements in his briefing, but we agree with defendant's claims.

As to each of counts 1 through 4, the jury found true the separate allegations that defendant personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and that a principal personally and intentionally discharged a firearm during the commission of the crimes (§ 12022.53, subds. (c), (e)(1)). Each of the enhancements specified in section 12022.53, subdivisions (b) through (d) provide for punishment of varying lengths for crimes involving a firearm--depending on how the firearm is used and the harm that results from the use--independent of any gang-related finding. However, pursuant to section 12022.53, subdivision (e)(1), these enhancements may also be imposed on any person who is a principal in the offense where the person violated section 186.22,

20

subdivision (b), and any principal in the offense committed any act specified in section 12022.53, subdivisions (b) through (d). Accordingly, where a jury finds true an enhancement allegation pursuant to section 12022.53, subdivision (e)(1), that finding must be vacated and remanded for retrial along with the gang enhancement allegations vacated pursuant to Assembly Bill No. 333's amendments to section 186.22. Here, because the jury's findings that a principal personally and intentionally discharged a firearm during the commission of the crimes charged in counts 1 through 4 were predicated upon its findings regarding the gang enhancement, we vacate these findings. (§ 12022.53, subds. (c), (e)(1).)

Because the state of the law has changed since defendant's original sentencing (see, e.g., *People v. Morrison* (2019) 34 Cal.App.5th 217, 222 [court exercising discretion to strike enhancement under § 1385 can instead impose lesser enhancement in the interest of justice]; *People v. Tirado* (2022) 12 Cal.5th 688, 697 ["*Morrison* correctly described the scope of a trial court's sentencing discretion under section 12022.53"]; § 1170, subd. (b)(1)-(3), as amended by Stats. 2021, ch. 731, § 1.3 [limiting sentencing court's ability to impose aggravated term of imprisonment absent specific circumstances]; § 654, as amended by Stats. 2021, ch. 441, § 1 [authorizing sentencing court to punish a defendant under "either of such provisions" where an act or omission is punishable in different ways by different provisions of law]), the trial court is directed to conduct a full resentencing on remand after all charges and allegations against defendant are resolved (*People v. Buycks* (2018) 5 Cal.5th 857, 893).

## DISPOSITION

We vacate the gang enhancements (§ 186.22, subd. (b)(1)) found true as to counts 1 through 6, 8, and 9, and the gang-related firearm enhancements (§ 12022.53, subds. (c), (e)(1)) as to counts 1 through 4. We remand the matter to the trial court to provide the prosecution with the opportunity to retry the sections 186.22 and 12022.53, subdivisions (c) and (e)(1) enhancement allegations under the law as amended by Assembly Bill No.

21

333 and to provide defendant with a full resentencing at the conclusion of retrial or at such time as the prosecution elects not to retry the vacated enhancement allegations.  In all other respects, the judgment is affirmed.

          /s/

Duarte, J.

We concur:

    /s/

Blease, Acting P. J.

    /s/

Hoch, J.